IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| BRANDON GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 123-114 |
| | ) | |
| RICHMOND CO. SHERIFF'S DEPT.; | ) | |
| RICHMOND CO. INTERNAL AFFAIRS; | ) | |
| SEAN MCKENZIE; CINDY JONES; | ) | |
| INTEL. J. THOMAS; CAPT. JENKINS; | ) | |
| SGT. FLUELLEN; SGT. SEYMORE; CAPT. | ) | |
| WHITE; SGT. T. STERNS; LT. ASHLEY; | ) | |
| SGT. ROBERTS; OFC. ROBERSON; OFC. | ) | |
| GABREIAL; OFC. MORRISON; LT. M. | ) | |
| CHEATAM; SGT. N. COWART; MAJOR | ) | |
| MITCHELL; LT. SHELTON; SGT. | ) | |
| GEETINGS; CPL. COLEMAN; CPL. | ) | |
| CULYER; SGT. MATTHYS; CAPT. | ) | |
| DANIELS; LT. N. HARRELL; and JOHN | ) | |
| DOE, | ) | |
| | ) | |
| Defendants.[1] | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Plaintiff, a pretrial detainee at Charles B. Webster Detention Center ("Webster Detention Center") in Augusta, Georgia, filed this case pursuant to 42 U.S.C. § 1983. He is proceeding *pro se* and *in forma pauperis* ("IFP"). On October 2, 2023, the Court screened the

---

[1] The Court **DIRECTS** the **CLERK** to update the list of Defendants in accordance with the caption on this Order, which is consistent with Plaintiff's Second Amended Complaint. (Doc. no. 58.) Moreover, the Court notes Defendant "Ofc. Morris" was originally incorrectly named, (see doc. nos. 8, 28), and is the Defendant named "Ofc. Morrison" in the Second Amended Complaint. (See doc. no. 58, p. 12.) As there is no Defendant Morris, the Court **DIRECTS** the **CLERK** to update the list of Defendants, correcting Defendant Morris's name to "Ofc. Morrison."

First Amended Complaint and directed service of process on Defendants Mitchell, Morrison, Gabreial, Cowart, Coleman, Cheatam, Sterns, and Culyer based on Plaintiff's allegations.  (See doc. nos. 14-16.)  With leave of court, (see doc nos. 47, 50), Plaintiff filed the Second Amended Complaint on February 12, 2024, (doc. no. 58).[2]

As the Court previously explained to Plaintiff, the Second Amended Complaint supersedes and replaces in its entirety the previous pleading.  See Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016); Lowery v. Ala. Power Co., 483 F.3d 1184, 1219 (11th Cir. 2007).  Because he is proceeding IFP, the Second Amended Complaint must be screened to protect potential defendants.  Phillips v. Mashburn, 746 F.2d 782, 785 (11th Cir. 1984) (*per curiam*); Al-Amin v. Donald, 165 F. App'x 733, 736 (11th Cir. 2006) (*per curiam*).

## I.   BACKGROUND

The Second Amended Complaint names the following Defendants:  (1) Richmond County Sheriff's Department ("Sheriff's Department"), (2) Richmond County Internal Affairs ("Internal Affairs"), (3) Sean McKenzie, (4) Cindy Jones, (5) Intel. J. Thomas, (6) Captain Jenkins, (7) Sergeant Fluellen, (8) Sergeant Seymore, (9) Captain White, (10) Sergeant T. Sterns, (11) Lieutenant Ashley, (12) Sergeant Roberts, (13) Officer Roberson, (14) John Doe, (15) Officer Gabreial, (16) Officer Morrison, (17) Lieutenant Cheatam, (18) Sergeant N. Cowart, (19) Major Mitchell, (20) Lieutenant Shelton, (21) Sergeant Geetings, (22) Corporal

---

[2] The Court acknowledges three documents on the docket identified as "Amended Complaints." (Doc. nos. 8, 45, 58.)  The first, (doc. no. 8), was Plaintiff's First Amended Complaint, which the Court screened on October 2, 2023.  The second, (doc. no. 45), was a procedurally improper attempt to amend Plaintiff's First Amended Complaint.  The Court explained the filing was improper, (doc. no. 46, pp. 3-4), Plaintiff subsequently requested leave of Court to amend, (doc. no. 47), and thereafter properly filed the third document titled "Amended Complaint," (doc. no. 58).  For clarity, and because Plaintiff's second attempt to amend was improper and that pleading was inoperative, (see doc. nos. 45-46), the Court **DIRECTS** the **CLERK** to update the docket text for doc. no. 58 to read "SECOND AMENDED COMPLAINT."

Coleman, (23) Corporal Culyer, (24) Sergeant Matthys, (25) Captain Daniels, and (26) Lieutenant N. Harrell.  (Doc. no. 58, pp. 2-3, 12.)  Defendants Sheriff's Department and Internal Affairs are named in their individual and official capacities, while all remaining Defendants are named only in their individual capacities.[3]  (Id.)  Taking all of Plaintiff's allegations as true, as the Court must for purposes of the present screening, the facts are as follows.

On January 10, 2023, Plaintiff was housed in protective custody on the bottom tier of G-Pod.  (Id. at 13.)  During "rec rotation," Defendant Deputy Sean McKenzie unlocked the doors to the top tier, in violation of protective custody protocol requiring separation of bottom and top tier inmates.  After Deputy McKenzie unlocked the doors, top tier inmates threatened to rob and assault Plaintiff.  (Id.)  Deputy McKenzie was in the dorm when this happened and witnessed the threats against Plaintiff.  (Id.)

That afternoon, Deputy McKenzie unlocked all the cell doors and left G-Pod to allow Plaintiff to be robbed.  (Id.)  Several inmates entered Plaintiff's cell with shanks and stole his commissary items.  (Id.)  Plaintiff notified his fiancé, Latia Murray, because he feared his life was in danger.  (Id.)  Ms. Murray emailed Defendants Sheriff's Department, Internal Affairs, Intel. J. Thomas, Captain Jenkins, and Lieutenant N. Harrell to inform them about the incident. (Id.)

---

[3] Plaintiff's First Amended Complaint named all Defendants in their individual and official capacities.  (See doc. no. 8, pp. 2-4.)  However, his Second Amended Complaint names only the Sheriff's Department and Internal Affairs in both individual and official capacities, (doc. no. 58, p. 2), and all other Defendants are named only in their individual capacities, (id. at 3, 12.)  Thus, the Court **DIRECTS** the **CLERK** to update the list of Defendants to reflect the Richmond County Sheriff's Department and Richmond County Internal Affairs are sued in both their individual and official capacities, and all other Defendants are named only in their individual capacities.

On January 12, 2023, Plaintiff filed a grievance, but Defendants Cindy Jones, Sergeant Fluellen, and Sergeant Seymore took no action against Deputy McKenzie or the inmates who robbed Plaintiff.  (Id.)  According to jail records, Internal Affairs reviewed the incident in response to Ms. Murray's email but returned the case to Webster Detention Center for resolution of the grievance. (Id. at 28.) Ms. Jones informed Plaintiff no action would be taken because Plaintiff was in cell G-C-4 during the incident, and not his assigned cell G-C-6.  (Id.; see also id. at 27-28.)  However, Webster Detention Center records indicate one inmate was relocated from G-Pod following the incident.  (Id. at 28.)  Deputy McKenzie falsely stated the incident was about a stolen phone PIN code, but camera footage belies this account, as it demonstrates Plaintiff was not permitted outside for recreation with top tier inmates.  (Id. at 13; see also id. at 30.)

When the Sheriff's Department failed to punish the inmates involved in the January 10th robbery and continued to house Plaintiff in the same dorm with them, Plaintiff and Ms. Murray contacted the Southern Center for Human Rights ("Southern Center") for assistance. (Id.)  An Intake Coordinator visited Plaintiff at Webster Detention Center and was "very disturbed" by Plaintiff's situation.  (Id. at 14.)  Thereafter, the Southern Center sent Sheriff Richard Roundtree a letter alleging Defendants knew Plaintiff's safety was in jeopardy but failed to take action. (Id.) After Sheriff Roundtree received the letter, Plaintiff was reclassified and moved to A-Pod.  (Id.)

Plaintiff had no trouble in A-Pod for the first few weeks until May, when the Sheriff's Department placed five known, active gang members in A-Pod.  (Id.)  These five inmates were previously caught on video in a gang-affiliated fight in G-Pod that resulted in a stabbing.  (Id.) When they arrived at A-Pod, the five gang-affiliated inmates began robbing other inmates and

demanding inmates pay money to them in order to stay in A-Pod.  (Id.)  Ms. Murray and other family members of A-Pod inmates emailed Internal Affairs and called the Sheriff's Department to make them aware of the gang-affiliated inmates' actions.  (Id.)  Plaintiff also reported the situation to Defendant Captain White.  (Id.)  In response, Defendants did nothing to ensure the safety of Plaintiff and other A-Pod inmates.  (Id.)

One afternoon, Plaintiff and two other A-Pod inmates, Teaquez Bright and Chezere Coppock, left A-Pod to report the security threat posed by the gang-affiliated inmates to jail security officials Defendants Sergeant T. Sterns, Lieutenant Ashley, and Sergeant Roberts. (Id.)  Plaintiff, Mr. Bright, and Mr. Coppock explained the gang-affiliated inmates all had shanks, none of the doors in A-Pod locked, and they did not feel safe.  (Id.)  Sergeant T. Sterns, Lieutenant Ashley, and Sergeant Roberts forced Plaintiff, Mr. Bright, and Mr. Coppock to return to A-Pod.  (Id.)  The jail officials conducted a shakedown of the gang-affiliated inmates. (Id.)  During the shakedown, Plaintiff observed the gang-affiliated inmates exit their cells and slide weapons under a door.  (Id.)  Neither Plaintiff nor the gang-affiliated inmates were moved from A-Pod following the shakedown.  (Id.)

On an undisclosed subsequent date, four of the gang-affiliated inmates Plaintiff had been complaining to Defendants about approached Plaintiff with shanks and forced him to call Ms. Murray.  (Id. at 15.)  The gang-affiliated inmates told Ms. Murray they would hold Plaintiff captive until she transferred $300 to a CashApp account.  (Id.)  Ms. Murray reported this hostage situation to the Sheriff's Department, but no one helped.  (Id.)  Webster Detention Center officials conducted a fake shakedown that evening but did not speak with Plaintiff about the incident or move Plaintiff from A-Pod.  (Id.)  Plaintiff handed notes to Defendants Sergeant Seymore, Deputy Roberson, and a John Doe jail official, explaining his life was in danger and

gang-affiliated inmates were going to stab Plaintiff if he failed to send the money by CashApp. (Id.)  Another inmate also told Webster Detention Center officials Plaintiff's life was in danger, but no action was taken to protect Plaintiff.  (Id.)  Plaintiff repeatedly lied to the gang-affiliated inmates to prevent them from stabbing him for failing to send the money.  (Id.)

After a few days of lying to the gang-affiliated inmates, making reports to Webster Detention Center officials, and continuing to be threatened with no action, Plaintiff realized Defendants would let Plaintiff be killed.  (Id.)  Plaintiff, accompanied by Mr. Bright, went to the A-Pod recreation yard and refused to return to the dorm out of concern for Plaintiff's safety. (Id.)  When Webster Detention Center officials addressed Plaintiff's refusal to return to the A-Pod dorm, Plaintiff requested to press charges.  (Id.)  Unspecified defendants then moved the gang-affiliated inmates out of A-Pod.  (Id.)

Despite Plaintiff being a victim of the CashApp incident, the Sheriff's Department filed a disciplinary report against Plaintiff for his involvement.  (Id.)  Officials restricted Plaintiff's phone and visitation privileges to limit Plaintiff's ability to discuss the incident with his family. (Id.)

On June 28, 2023, an inmate with the last name Butler robbed and assaulted Plaintiff in A-Pod.  (Id. at 16.)  Mr. Butler, a Crips gang member, entered Plaintiff's cell with a shank and stole Plaintiff's commissary items while other Crips members stood outside the cell.  (Id.) Defendant Officer Gabreial watched this incident take place, walked away, and did nothing to intervene.  (Id.)  Plaintiff forced his way out of his cell and told Officer Ellison, who was in an observation tower in A-Pod, about the robbery.  (Id.)  Officer Ellison called a code, but no one responded.  (Id.)  When Officer Gabreial returned, Plaintiff informed him about the robbery, but Officer Gabreial smiled and walked away.  (Id.)  Realizing Webster Detention Center

officials were not going to assist Plaintiff with getting his commissary items back, Plaintiff called Ms. Murray; Antonio Greene, Plaintiff's brother; and Anita James, the mother of Plaintiff's child, to inform them Plaintiff was robbed, Webster Detention Center officials were not doing anything about it, and Plaintiff feared for his safety. (Id.)

An hour after Plaintiff made those phone calls, Defendants Lieutenant Cheatam and Officer Morrison approached Plaintiff's cell. (Id.) Ms. James had called the Sheriff's Department about the robbery and asked Lieutenant Cheatam why nothing was being done about it. (Id.) Lieutenant Cheatam was upset about the call and told Plaintiff he was tired of Plaintiff's family calling the jail. (Id.) Lieutenant Cheatam made the other inmates in Plaintiff's dorm go to the recreation yard, made Plaintiff pack his property, and moved Plaintiff back to protective custody in G-Pod. (Id.) Lieutenant Cheatam knew Plaintiff was not supposed to be housed in that dorm again because he had been robbed there previously. (Id.) G-Pod is overcrowded, all of the doors are broken, many inmates have shanks, and inmates are frequently stabbed. (Id.)

Officer Morrison escorted Plaintiff to G-Pod but did not assign him a cell, as there was no room to assign Plaintiff a place to sleep. (Id. at 17.) Upon arriving in G-Pod, Plaintiff realized Lieutenant Cheatam moved him there so he would be hurt. (Id.) Plaintiff observed the same inmates who participated in the January 10th robbery gathering together and tried to get Officer Morrison's attention by hitting the observation tower window, but Officer Morrison continued to look away from Plaintiff. (Id.) When the inmates realized Officer Morrison was not responding to Plaintiff, they approached Plaintiff and began robbing commissary items from him. (Id.) While Plaintiff was being robbed, he saw Officers Evans and Price in the observation tower, watching the incident, and believed Officer Morrison was going to render

assistance and move Plaintiff out of the dorm.  (Id.)  However, when Officer Morrison exited the observation tower, he entered a different dorm in G-Pod.  (Id.)  When Officer Morrison entered the other dorm, three inmates attacked Plaintiff and stabbed him in the head.  (Id.)  Officer Evans took Plaintiff to medical, and Plaintiff was then taken to the hospital, where he received staples in his head to close the wound.  (Id. at 17-18.)

While at the hospital, Plaintiff told two officers that he feared for his life and safety while in custody of the Sheriff's Department and told them about his experience at Webster Detention Center.  (Id. at 17.)  He asked the officers to report his grievances to the Georgia Bureau of Investigation and Internal Affairs and requested those agencies speak with Plaintiff and review camera footage of the various incidents.  (Id.)  When Plaintiff returned to Webster Detention Center from the hospital, one of the officers relayed Plaintiff's fears and requests to Defendant Sergeant N. Cowart.  (Id.)  In response, Sergeant Cowart housed Plaintiff in a "suicide strip cell" that was not clean and had a broken toilet that would not flush.  (Id. at 17-18.)  Sergeant Cowart told Plaintiff he would only be housed in the strip cell for a few hours, until they could find a safe place to house him.  (Id. at 18.)

For the first week of Plaintiff being housed in the strip cell, he was not permitted to contact anyone, shower, or receive medical treatment.  (Id.)  Plaintiff's father visited Plaintiff, at which point Defendant Major Mitchell allowed Plaintiff to shower.  (Id.)  Plaintiff had not showered since he was stabbed and was still bloody from the attack.  (Id.)  Plaintiff's father informed him that Ms. Murray and two of Plaintiff's sisters contacted the Sheriff's Department and spoke with Major Mitchell.  (Id.)  Sheriff's Department personnel were hostile and informed them Plaintiff was housed in the strip cell for disciplinary reasons.  (Id.)

While housed in the strip cell, Plaintiff was denied medical treatment, and was only able to have the staples removed from his head when he requested assistance from a nurse who was in the area.  (Id.)  Because the toilet in the strip cell would not flush, Plaintiff was forced to use the restroom on trays, in cups, and in the trash.  (Id.)  Despite these conditions and the resulting odor, Plaintiff was not permitted to clean the cell.  (Id.)  Plaintiff informed Defendants Lieutenant Shelton, Sergeant Roberts, and Sergeant Geetings about these issues, but they ignored Plaintiff.  (Id.)

Plaintiff's phone and shower privileges were also restricted while he was in the strip cell.  (Id.)  He was permitted to shower and make phone calls only once or twice a week, typically between 2:00 and 4:00 AM.  (Id.)  When Plaintiff's family stopped hearing from Plaintiff regularly, they called Webster Detention Center and inquired about Plaintiff's loss of privileges.  (Id.)  Thereafter, Webster Detention Center officials began issuing unfounded disciplinary reports to justify restricting Plaintiff's privileges.  (Id. at 18-19.)

On August 10, 2023, Sergeant Cowart wrote a disciplinary report against Plaintiff and placed Plaintiff on disciplinary segregation, restricting his privileges to showers only.  (Id. at 19.)  The disciplinary report was not processed until two weeks later, and when Plaintiff was sanctioned, Sergeant Fluellen gave Plaintiff no credit for the two weeks he had already been on disciplinary segregation.  (Id.)

On August 15, 2023, Plaintiff had two teeth pulled by a dentist.  (Id.)  A nurse informed Webster Detention Center officials Plaintiff should not be housed in the strip cell following surgery because he needed running water to keep his mouth rinsed.  (Id.)  The nurse also informed Webster Detention Center officials Plaintiff should not be housed in the strip cell due to his medications for high blood pressure and kidney failure.  (Id.)

On August 23, 2023, Plaintiff received legal mail from the Court and asked Defendant Corporal Coleman if he could call his family to hire a lawyer and take a shower, since it had been over a week since his last shower.  (Id.)  Corporal Coleman told Plaintiff he could because Plaintiff does not cause problems.  (Id.)  The next day, Corporal Coleman took Plaintiff and another inmate to shower and use the phones.  (Id.)  After their showers, Corporal Coleman allowed the other inmate to make phone calls, but left Plaintiff in the humid shower area for over three hours, where he nearly fainted.  (Id.)  When Corporal Coleman did allow Plaintiff to exit the showers and make a phone call, he made Plaintiff hang up the phone as soon as someone answered.  (Id.)

On August 26, 2023, Defendant Corporal Culyer took all of Plaintiff's property, including legal mail from this Court and from the Southern Center.  (Id.)  Corporal Culyer removed Plaintiff from the strip cell and put him in the "hole," the worst dorm at Webster Detention Center.  (Id.)  In this dorm, the doors are broken and inmates are regularly stabbed. (Id. at 20.)  Plaintiff cut his wrist and told officials he was planning to kill himself in order to be assigned to a different dorm, at which time he was placed back in the strip cell.  (Id.)

On August 30, 2023, Plaintiff was asleep in the strip cell when Officers Morrison and Gabreial opened his cell door and hit Plaintiff in the head with two frozen packs.  (Id.)  The next day, Officers Morrison and Gabreial refused to feed Plaintiff.  (Id.)

Throughout the month of September, Webster Detention Center officials largely ignored Plaintiff and treated him poorly.  (Id.)  Plaintiff was permitted to take three showers that month.  (Id.)

On October 6, 2023, Plaintiff was permitted to shower and asked a Webster Detention Center official how much longer his privileges were restricted to showers only.  (Id.)  Sergeant

Geetings refused to allow the official to print Plaintiff's disciplinary reports, so Plaintiff remained unaware of how much longer he was assigned to disciplinary segregation. (Id.)

Plaintiff was housed in the strip cell, with the exception of his brief housing assignment in the hole, from June 28th through November 1st, when this Court held a hearing in the instant case. (Id.; see also id. at 21; doc. no. 32.) During this time, Defendants denied Plaintiff running water, drinking water, a functioning toilet, visitation privileges, and access to the kiosk to file grievances, the law library, unspecified legal resources, and his personal mail. (Doc. no. 58, p. 20.) Plaintiff estimates he was only permitted to order legal materials from commissary approximately three times while housed in the strip cell. (Id.) Plaintiff showed his legal mail from this Court to various Webster Detention Center officials and asked them to relay to their supervisors, Lieutenants N. Harrell and Shelton, that Plaintiff had upcoming deadlines and needed to be able to make purchases from commissary while on administrative segregation. (Id. at 21.) When Plaintiff attempted to make purchases from commissary, the commissary manager told Plaintiff he was not permitted to do so per Major Mitchell's instructions. (Id.)

At the hearing on November 1, 2023, Major Mitchell and counsel provided the Court with inaccurate information about Plaintiff's prisoner trust fund account to prevent Plaintiff from proceeding in forma pauperis. (Id.) Following the hearing, Defendant Mitchell told Plaintiff he was not required to obey any of the directions provided by the undersigned at the hearing because there was no written Court order requiring action on the part of Webster Detention Center. (Id.) While Major Mitchell did move Plaintiff out of the strip cell and into an intake cell following the hearing, Plaintiff's privileges continued to be restricted and Plaintiff was still on administrative segregation. (Id.) Major Mitchell imposed restrictions unique to Plaintiff, including that Plaintiff cannot use the intake phones or have recreation time

during the day. (Id. at 21-22.) When Plaintiff was permitted to make calls or have recreation time, Webster Detention Center officials took him to H-Pod, where the doors do not properly lock. (Id. at 22.) As a result, these restrictions imposed by Major Mitchell place Plaintiff in danger and make him a target, because it appears Plaintiff is a snitch to other inmates. (Id.) No other inmates housed in intake on administrative segregation are subject to these restrictions. (Id. at 21.)

While housed in intake, Plaintiff wrote a letter to Major Mitchell and counsel, but received no response. (Id. at 22.) Sergeant Cowart oversees intake and taunts, harasses, and references the instant suit when Plaintiff asks her permission to do anything. (Id.) Defendant Lieutenants Shelton and Harrell and Sergeants Matthys, Geetings, and Cowart regularly write unfounded disciplinary reports against Plaintiff to justify keeping him housed in intake on administrative segregation. (Id.) When a disciplinary report is issued against Plaintiff, he is punished immediately, without an opportunity to receive a copy of the report, have a hearing regarding the allegations, or be formally sentenced. (Id.) Plaintiff is also not given credit for time served on administrative segregation when he is punished for new disciplinary reports. (Id.)

Because Plaintiff has not been permitted access to a kiosk to submit grievances, he has filed handwritten grievances about all issues he describes in his Second Amended Complaint. (Id. at 23.) The Sheriff's Department refuses to respond to Plaintiff's grievances or house Plaintiff in a dorm with access to a kiosk. (Id.) Plaintiff spoke to Defendants Captain Daniels and Lieutenant Ashley about his belief Webster Detention Center officials are retaliating against him for filing the instant suit. (Id.) In response, Captain Daniels and Lieutenant Ashley signed and approved disciplinary reports filed against Plaintiff three weeks prior, and still did

not give Plaintiff credit for time served in administrative segregation when determining his sentence.  (Id.)  Plaintiff has been sentenced to forty-five to sixty days of administrative segregation for each disciplinary report, most of which are for minor alleged disciplinary issues.  (Id.)

Plaintiff reported Defendants' actions to Dr. Barnes, his counselor at Webster Detention Center.  (Id. at 5, 23.)  Dr. Barnes documented Plaintiff's reported issues and said he voiced concerns to Defendants, but Plaintiff has not seen any change in his treatment by Webster Detention Center officials.  (Id. at 23.)  In fact, the more Plaintiff speaks out and seeks help, the worse he is treated by Defendants.  (Id.)

Plaintiff requests injunctive relief and compensatory and punitive damages.  (Id. at 5.)

## II.  DISCUSSION

### A.  Legal Standard for Screening

The Second Amended Complaint or any portion thereof may be dismissed if it is frivolous, malicious, or fails to state a claim upon which relief may be granted, or if it seeks monetary relief from a defendant who is immune to such relief.  See 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).  A claim is frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319, 325 (1989).  "Failure to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard as dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6)."  Wilkerson v. H & S, Inc., 366 F. App'x 49, 51 (11th Cir. 2010) (per curiam) (citing Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)).

To avoid dismissal for failure to state a claim upon which relief can be granted, the allegations in the Second Amended Complaint must "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. While Rule 8(a) of the Federal Rules of Civil Procedure does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. A complaint is insufficient if it "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" or if it "tenders 'naked assertions' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 555, 557). In short, the Second Amended Complaint must provide a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, the Court affords a liberal construction to a *pro se* litigant's pleadings, holding them to a more lenient standard than those drafted by an attorney. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (*per curiam*); Haines v. Kerner, 404 U.S. 519, 520 (1972) (*per curiam*). However, this liberal construction does not mean that the Court has a duty to re-write the Second Amended Complaint. Bilal v. Geo Care, LLC, 981 F.3d 903, 911 (11th Cir. 2020); Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006).

### A.     Defendants Sheriff's Department and Internal Affairs Are Not Legal Entities Subject to Suit

Defendants Sheriff's Department and Internal Affairs are not proper parties because sheriff's departments and their subdivisions are not legal entities capable of being sued. See Herrington v. Effingham Cnty. Sheriff's Office, CV 411-099, 2011 WL 2550464, at *1 (S.D. Ga. Apr. 21, 2011) ("However, [Plaintiff] cannot sue the sheriff's department because it is not

capable of being sued." (citing <u>Dean v. Barber</u>, 951 F.2d 1210, 1214 (11th Cir. 1992), and collected cases)), *adopted by* 2011 WL 2550459 (S.D. Ga. June 27, 2011); <u>Smith v. Dekalb Ctny. Sheriff's Off.</u>, Civil Action No. 109-CV-2820, 2010 WL 308984, at *2 (N.D. Ga. Jan. 22, 2010) (same); <u>Morris v. Chatham Cnty. C.N.T. Div.</u>, No. 418-CV-272, 2019 WL 993623, at *1 (S.D. Ga. Mar. 1, 2019) ("Police Departments, and by extension their subdivisions, are not entities subject to suit under § 1983."). Further, appropriate parties for suit under § 1983 include "persons" who participated in the alleged violation. <u>See</u> 42 U.S.C. § 1983 (subjecting only "persons" to liability); <u>Ga. Insurers Insolvency Pool v. Elbert Cnty.</u>, 368 S.E.2d 500, 502 (Ga. 1988) (limiting § 1983 liability to "(1) natural persons; (2) an artificial person (a corporation); and (3) such quasi-artificial persons as the law recognizes as being capable to sue" (quotations omitted)). Thus, Defendants Sheriff's Department and Internal Affairs are not capable of being sued and should be dismissed.

### B. Plaintiff Fails to State a Claim Against Defendants Cindy Jones, Intel. J. Thomas, and Sergeant T. Sterns

Plaintiff fails to state valid claims for deliberate indifference to his safety[4] against Defendants Jones, Thomas, and Sterns. A prison official may violate an inmate's constitutional rights by acting with 'deliberate indifference' to a substantial risk of serious harm or disregarding a such a risk. <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994) (citations omitted). Accordingly, a prison inmate has a constitutional right to be protected from violence

---

[4] While these deliberate indifference claims arise under the Fourteenth Amendment because Plaintiff is a pretrial detainee, the standards are the same under both the Fourteenth and Eighth Amendments for such claims. <u>Ireland v. Prummell</u>, 53 F.4th 1274, 1288 & n.4 (11th Cir. 2022) (applying Eighth Amendment caselaw to pretrial detainee deliberate indifference claims); <u>see also</u> <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) (applying Eighth Amendment caselaw to pretrial detainee deliberate indifference claims and explaining, "[r]egardless of the particular taxonomy under which we analyze the case . . . , the result is the same, because 'the standards under the Fourteenth Amendment are identical to those under the Eighth.'" (quoting <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007))).

and from physical assault by other inmates.  Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984) (*per curiam*); Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981).  When officials become aware of a threat to an inmate's health and safety, they have a duty to provide reasonable protection.  Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (*per curiam*).  However, "[t]his does not mean that the constitutional rights of inmates are violated every time a prisoner is injured.  It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials."  Gullatte, 654 F.2d at 1012.  "[T]here must be at least some allegation of a conscious or callous indifference to a prisoner's rights" that would raise the tort to the level of a constitutional violation in order to state a section 1983 cause of action against prison officials for cruel and unusual punishment.  Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982) (citations omitted).

"Although 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners,' not every instance of inmate on inmate violence 'translates into constitutional liability for prison officials responsible for the victim's safety.'"  Terry v. Bailey, 376 F. App'x 894, 895 (11th Cir. 2010) (*per curiam*) (citing Farmer, 511 U.S. at 833-34).  To establish a failure to protect claim, a prisoner "must allege facts sufficient to show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal quotations omitted).  These three elements are evaluated in part by an objective standard and in part by a subjective standard.  See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

As the Eleventh Circuit explained,

> When examining the first element—a substantial risk of serious harm—the court uses an objective standard. The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm. To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted).

Mere negligent failure to protect an inmate from an attack does not justify § 1983 liability. Brown, 894 F.2d at 1537. Stated otherwise, liability cannot be based on simple negligence or lack of due care, but rather requires some sort of conscious disregard of a serious and imminent risk. Farmer, 511 U.S. at 835-39; see also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (requiring a plaintiff to show "more than mere negligence," and stating that courts are to look for "obduracy and wantonness, not inadvertence or error in good faith.").

In the Second Amended Complaint, Plaintiff sues Defendant Sergeant T. Sterns because he was one of three Webster Detention Center officials Plaintiff informed about security threats posed by gang-affiliated inmates in A-Pod. In response, Sergeant Sterns and his colleagues conducted a "shakedown" of the gang-affiliated inmates but made no effort to relocate Plaintiff or the gang-affiliated inmates from A-Pod. Plaintiff does not allege this Defendant knew of any specific threats to Plaintiff or had advance knowledge Plaintiff would be subject to the CashApp incident sometime in the future. That the gang-affiliated inmates were able to hide their weapons during the shakedown may suggest negligence or lack of due care on the part of Webster Detention Center officials conducting the search but falls short of demonstrating the conscious or callous indifference required to state a claim of deliberate

17

indifference to Plaintiff's safety against Sergeant Sterns.  See Farmer, 511 U.S. at 835-39; Adams, 61 F.3d at 1543; Williams, 689 F.2d at 1380.  These allegations fail to state a deliberate indifference claim against Defendant Sterns.[5]

Plaintiff sues Defendant Thomas because he received an email from Ms. Murray following the January 10th incident, informing him Defendant McKenzie attempted to have Plaintiff harmed by fellow inmates.  Plaintiff has not alleged Defendant Thomas actually (subjectively) knew Plaintiff faced a substantial risk of serious harm, let alone that they disregarded any such known risk.  In fact, the attachments to Plaintiff's Second Amended Complaint demonstrate Ms. Murray's report was investigated by Internal Affairs and the issue was referred back to Webster Detention Center for handling.  Plaintiff does not allege Defendant Thomas had any awareness of a threat to Plaintiff prior to the January 10th robbery, nor that his alleged subsequent inaction caused any subsequent harm to Plaintiff.  Thus, Plaintiff fails to state a failure to protect claim against Defendant Thomas.

Plaintiff sues Defendant Jones because she processed Plaintiff's grievance regarding the January 10th incident but allegedly took no action against Plaintiff or the inmates who robbed him.  Plaintiff has not alleged Defendant Jones actually (subjectively) knew Plaintiff faced a substantial risk of serious harm, let alone that she disregarded any such known risk.  In fact, the attachments

---

[5] Claims against Defendant Sterns for failure to protect or intervene were previously allowed to proceed based on the allegations in Plaintiff's First Amended Complaint and Defendant Sterns was served in accordance with the Court's prior screening Order.  (Doc. no. 16, p. 6; see also doc. no. 8, p. 12; doc. no. 20, pp. 3-4.)  However, Plaintiff no longer makes the same claims against Defendant Sterns in the Second Amended Complaint.  (Compare doc. no. 8, with doc. no. 58.)  As the Second Amended Complaint supersedes the prior pleadings, the Court now considers only Plaintiff's allegations against Defendant Sterns in the Second Amended Complaint.  Given the Court's present recommendation Defendant Sterns be dismissed from this case, Defendant Sterns is not required to answer the Second Amended Complaint as described in the simultaneously entered Order.  In the event the presiding District Judge does not adopt the recommendation Defendant Sterns be dismissed, the Court will provide further instructions to Defendant Sterns regarding his obligation to answer the Second Amended Complaint.

to Plaintiff's Second Amended Complaint demonstrates an inmate who robbed Plaintiff on January 10th was relocated from G-Pod.  Plaintiff does not allege Defendant Jones had any awareness of a threat to Plaintiff prior to the January 10th robbery.  See Beasley v. Danzey, No. 2:17-CV-375, 2017 WL 6003098, at *5 (M.D. Ala. Oct. 13, 2017), *adopted by* 2017 WL 5986967 (M.D. Ala. Dec. 1, 2017) ("The general allegations made by [Plaintiff] regarding a potential threat to his safety from [an identified inmate] and unidentified gang members do not provide an objective basis on which to find [another inmate] posed a serious risk of harm to [Plaintiff]."); cf. Johnson v. Lewis, 83 F.4th 1319, 1329 (11th Cir. 2023) (finding defendant who signed grievance form may be liable where grievance documented ongoing, rather than isolated, risk to Plaintiff's health and safety).

To the extent Plaintiff's allegations could be read to suggest his grievance put Webster Detention Center administrators on notice that keeping Plaintiff and the other inmates who robbed him in G-Pod could be problematic, or the group of inmates acted violently toward Plaintiff, general knowledge of a violent history is not sufficient to state a claim of deliberate indifference to Plaintiff's safety.  See Marbury, 936 F.3d at 1237-38; Carter v. Galloway, 352 F.3d 1346, 1349-50 (11th Cir. 2003) (*per curiam*) (requiring "much more than mere awareness" of an inmate's "generally problematic nature" to impose liability for failing to protect against attack).  Moreover, Plaintiff's dissatisfaction with the outcome of the grievance processed by Ms. Jones is insufficient to state a due process claim.  Moore v. McLaughlin, 569 F. App'x 656, 659 (11th Cir. 2014) ("[B]ecause [Plaintiff] had no constitutionally protected liberty interest in access to the prison's grievance procedure, he cannot base a § 1983 claim on the Defendants' response to his grievances."); Green v. Williams, No. 20-60723-CV, 2020 WL 7774727, at *5 (S.D. Fla. Oct. 8, 2020), *adopted by*, 2020 WL 7770401 (S.D. Fla. Dec. 30, 2020) ("[A] prisoner's . . . overall

dissatisfaction with a response to a grievance does not articulate a due process claim, as there is no constitutional right to the grievance procedure at all."). Thus, Plaintiff fails to state a claim against Ms. Jones for her handling of Plaintiff's grievance.

### C.  Plaintiff Inadequately Identifies Defendant John Doe

Plaintiff alleges he handed a note to three Webster Detention Center officials, including John Doe, during the CashApp ordeal, but no action was taken by these officials to protect Plaintiff. (Doc. no. 58, p. 15.)  Generally, "fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) (citation omitted). An exception exists, "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" Id. (quoting Dean, 951 F.2d at 1215-16). In Richardson, the Eleventh Circuit Court of Appeals found merely describing a John Doe defendant as a correctional officer "was insufficient to identify the defendant among the many guards employed [at the facility.]" Id.

Plaintiff has provided insufficient information to identify this John Doe Defendant. The Court knows nothing about John Doe except that he was a Webster Detention Center official present in A-Pod sometime in May or June of 2022. (See generally doc. no. 58.)  Thus, the Court must recommend dismissal of Defendant John Doe without prejudice.

## III.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** dismissal of all claims against Defendants Richmond County Sheriff's Department, Richmond County Internal Affairs, Cindy Jones, Intel J. Thomas, Sergeant T. Sterns. Further, the Court recommends dismissal of John Doe without prejudice because he is insufficiently identified. By separate Order, the Court allows individual capacity claims to proceed against Defendants

Mitchell, Jenkins, McKenzie, Fluellen, Seymore, White, Ashley, Roberts, Roberson, Gabreial, Morrison, Cheatam, Cowart, Shelton, Geetings, Coleman, Culyer, Matthys, Daniels, and Harrell.

SO REPORTED and RECOMMENDED this 5th day of April, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA