IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| BRANDON GREENE, | * | SEP 26 2025 |
| Plaintiff, | * | |
| | * | FILED |
| v. | * | CV 123-114 |
| | * | |
| SEAN MCKENZIE; CPT. JENKINS; | * | |
| SGT. FLUELLEN; SGT. SEYMORE; | * | |
| CAPT. WHITE; LT. ASHLEY; | * | |
| SGT. ROBERTS; OFC. GROVER | * | |
| ROBINSON; OFC. GABRIEL; | * | |
| OFC. MORRISON; LT. M. CHEATHAM; | * | |
| SGT. N. COWART; MAJOR MITCHELL; | * | |
| LT. SHELTON; SGT. GEETINGS; | * | |
| CPL. COLEMAN; CPL.CULYER; SGT. | * | |
| MATTHYS; CAPT. DANIELS; and | * | |
| LT. N. HARRELL, | * | |
| | * | |
| Defendants.[1] | * | |

## O R D E R

Plaintiff, a pre-trial detainee at Charles B. Webster Detention Center ("Webster Center") in Augusta, Georgia, is proceeding *pro se* and *in forma pauperis* in this case brought pursuant to 42 U.S.C. § 1983. For the reasons set forth below, the Court **GRANTS IN PART** Defendants' summary judgment motion (doc. 87) and **GRANTS** summary judgment on the particularized claims of deliberate indifference to Plaintiff's safety against Defendants Mitchell, Seymore, Robinson, Gabriel, Cheatham, and Morrison. Thus, no claims remain

---

[1] The Court **DIRECTS** the **CLERK** to update the spelling of Defendants Ofc. Gabriel and Lt. M. Cheatham's names on the docket in accordance with the above caption. (<u>See</u> doc. 87-2.)

against Defendant Seymore and Defendant Robinson.   The claims remaining to be tried are as follows:

1. conditions of confinement claims against Defendants Mitchell, Shelton, Roberts, and Geetings;

2. claims of deliberate indifference to safety generally at Webster Center against Defendants Mitchell, Jenkins, White, Ashley, Cheatham, Shelton, Daniels, and Harrell;

3. due process claims against Defendants Mitchell, Cowart, Fluellen, Geetings, Shelton, Harrell, and Matthys;

4. claims of retaliation against Defendants Mitchell, Shelton, Cheatham, Geetings, Coleman, Culyer, Cowart, Matthys, Daniels, Harrell, and Ashley;

5. claims of excessive force against Defendants Morrison and Gabriel; and

6. a claim of deliberate indifference to Plaintiff's safety against Defendant McKenzie.

## I.   PROCEDURAL BACKGROUND

The Court screened the Second Amended Complaint and allowed the following claims to proceed:  (1) claims of excessive force against Defendants Morrison and Gabriel, (2) claims of deliberate indifference to Plaintiff's safety against Defendants Mitchell, McKenzie, Seymore, Robinson, Gabriel, Cheatham, and Morrison, (3) claims of deliberate indifference to safety generally at Webster Center against Defendants Mitchell, Jenkins, White, Ashley,

2

Cheatham, Shelton, Daniels, and Harrell, (4) claims of retaliation against Defendants Mitchell, Shelton, Cheatham, Geetings, Coleman, Culyer, Cowart, Matthys, Daniels, Harrell, and Ashley, (5) due process claims against Defendants Mitchell, Cowart, Fluellen, Geetings, Shelton, Harrell, and Matthys, and (6) conditions of confinement claims against Defendants Mitchell, Shelton, Roberts, and Geetings. (Doc. 61.)

Defendants moved for summary judgment on December 9, 2024, filing in support a brief and Statement of Material Facts ("SMF"). (Doc. nos. 87-1, 87-2.) The next day, the Clerk of Court issued a notice to Plaintiff concerning summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of failing to comply. (See doc. 88.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. On February 26, 2025, Plaintiff timely filed a response. (Doc. 92.)

Plaintiff responded with a lengthy statement in opposition that does not respond to each of Defendants' enumerated Statement of Material Facts but nonetheless contains detailed facts relevant to summary judgment and concludes with Plaintiff's signature and attestation "Plaintiff swears all claims are facts under penalty of perjury." (See id. at 22.) This filing is an adequate substitute for a sworn affidavit. See 28 U.S.C. § 1746; Roy v. Ivy, 53 F.4th 1338, 1349 (11th Cir. 2022). In addition, the same

3

summary judgment response refers to and incorporates the First Amended Complaint filed on November 16, 2023, (doc. 45), which is verified with an attestation that complies with 28 U.S.C. § 1746.[2] Also appropriate for consideration is the sworn declaration of Plaintiff, filed on May 10, 2024 as document number 69.

The Court deems admitted all portions of Defendants' SMF having evidentiary support in and not otherwise contradicted by the record, and which are not properly opposed by Plaintiff as contemplated under Federal Rule of Civil Procedure 56. See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (per curiam) (finding no error in deeming defendants' material facts admitted where pro se prisoner failed to respond with specific citations to evidence and valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).

However, this does not automatically entitle Defendants to summary judgment because as the movant, Defendants continue to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact." Reese v. Herbert,

---

[2] While the verified complaint "was superseded as the operative pleading, and therefore does not control which claims are at issue in this action, 'it is still a signed statement of facts equivalent to an affidavit with respect to factual matters within [P]laintiff's personal knowledge.'" Cassady v. Walker, No. CV 109-128, 2012 WL 899913, at *1 (S.D. Ga. Feb. 6, 2012) (quoting Boxdorfer v. Thrivent Fin. for Lutherans, Case No. 1:09-cv-109, 2009 U.S. Dist. LEXIS 69636, at *5 & n.2 (S.D. Ind. Aug. 10, 2009)), adopted by, No. CV 109-128, 2012 WL 899200 (S.D. Ga. Mar. 15, 2012), vacated in part on other grounds, 519 F. App'x 677, 679-80 (11th Cir. 2013) (per curiam).

527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). On this point, the Court observes Defendants' summary judgment motion and briefing is woefully short on citations to record evidence supporting their arguments and frequently resorts to the conclusory assertions that Plaintiff's sworn allegations are not credible or that Plaintiff, as the non-movant, has not proved his case. (See generally doc. 87-2.) Of course, the Court may not make credibility determinations at summary judgment. See Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006). Moreover, "[i]t is not enough to move for summary judgment . . . with a conclusory assertion that the plaintiff has no evidence to prove his case." Celotex Corp. v. Catrett, 477 U.S. 317, 328 (1986) (White, J., concurring); see also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

Moreover, the Court is mindful it "must construe the facts and draw all inferences in the light most favorable to the nonmoving party and 'when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version.'" Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (quoting Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005)). Thus, the Court will review the entire record "to determine if there is, indeed, no genuine issue of material fact." Mann, 588

F.3d at 1303; see also Scott v. Harris, 550 U.S. 372, 380 (2007).

## II.  FACTUAL BACKGROUND

### A.    Plaintiff's Sworn Allegations

Plaintiff is a pretrial detainee who was booked into Webster Center on April 20, 2021, on charges of drug trafficking, aggravated assault, and illegal firearms possession. (SMF ¶ 1.)   In his three sworn statements, Plaintiff alleges the following facts.

> ### 1. Plaintiff Alleges He Was the Victim of Four Violent Crimes in Six Months, With Three in the Same Month and Two on the Same Day

On January 10, 2023, while Plaintiff was housed in G-Pod, a protective custody unit, Defendant Sean McKenzie heard inmate Zaiara Smith and multiple other gang members threaten to rob and assault Plaintiff. (SMF ¶ 8; see also doc. 87-5, p. 1; doc. 69, p. 2.) Later that same day, Defendant McKenzie unlocked the doors separating the top and bottom tiers of the pod in violation of protective custody protocol requiring separation of top and bottom tier inmates. (Doc. 92, p. 7.) When he unlocked the doors, these same gang members who threatened Plaintiff walked downstairs armed with shanks and robbed Plaintiff, stealing commissary items. (Id.; Verified Compl., doc. 45, p. 4; doc. 69, p. 2.)

Fearing for his life, Plaintiff enlisted his fiancé, who emailed Internal Affairs and called jail officials Thomas, Jenkins, and Harrell. (Doc. 69, p. 3.)   No one took any action. (Id.) On January 12, 2023, Plaintiff filed a grievance regarding the robbery.

(SMF ¶ 11; doc. 87-5, p. 1.) According to the defense, jail officials determined no robbery occurred, Inmate Smith merely bullied Plaintiff into leaving his cell, Defendant McKenzie was not to blame, and Inmate Smith should be moved to another pod away from Plaintiff. (SMF ¶¶ 9-11.) Plaintiff claims these findings were based on false testimony from Defendant McKenzie and contradicted camera footage. (Doc. 69, p. 3.) Even after reviewing the footage, "Internal Affairs, Cindy Jones, Intel J. Thomas, Sgt. Seymore, Lt. Herrell, Sgt. Fluellen, and Captain Jenkins refused to take action . . . and left [Plaintiff] in the dorm with the inmates that robbed [him]." (Id.) After receiving a letter from the Southern Center for Human Rights complaining about the danger of continuing to house Plaintiff with his armed robbers, former Sheriff Roundtree moved Plaintiff to A-Pod. (Id.)

A few weeks after his transfer to A-Pod, "five known Gangsta Disciples" transferred into A-Pod who were "previously caught on video in a big gang-affiliated riot, gang fights, and stabbings" in G-Pod. (Id. at 4.) In approximately May 2023, these gang members began robbing inmates in A-Pod and "demanding the A-Pod inmates pay them money to stay in the dorm on A-Pod." (Id.) Plaintiff's fiancé emailed Internal Affairs and called the Sheriff's Department to notify them of these actions, and concerned family members of other A-Pod inmates engaged in similar efforts. (Id.) No action was taken. (Id.) Desperate for help, Plaintiff and several other inmates staged a protest. (Id.) In response,

jail officials conducted a shakedown of A-Pod and confiscated shanks, but the gang members remained in A-Pod even though officials knew the doors did not lock. (Id. at 4-5.) Plaintiff "reported [his] safety was in danger." (Id. at 5.)

In early June, these same gang members came to Plaintiff's cell armed with shanks and threatened to stab Plaintiff if his fiancé did not transfer $300 by cash app. (Doc. 92, p. 12; doc. 69, p. 5.) Plaintiff and his fiancé notified many jail officials about the threat, and his fiancé gave the perpetrators' cash app account information to the Sheriff's Department. (Doc. 69, p. 5.) Plaintiff "just kept lying to the gang members to keep them from stabbing [him] for not sending the money." (Id.) Desperate for action, Plaintiff refused to leave the recreation yard, which prompted Internal Affairs to become involved and transfer the offenders to another area of the jail. (Id.) "Despite Plaintiff being a victim in the cash app incident, the administration filed disciplinary reports on [him] then restricted [his] phone and visitation privileges to prevent [him] from being able to discuss the incident with his family." (Id.)

Later that same month, on June 28, 2023, at 9:45 p.m., while housed in A-Pod, gang members Anthony Butler and DeMichael Dawson entered Plaintiff's cell armed with shanks and robbed him. (Id. at 10; SMF ¶ 12.) During the robbery, fellow gang members gathered in support outside Plaintiff's cell. (Doc. 92, p. 10.) Plaintiff "banged on the window" and Officer Ellison, who was in the booth,

called for backup, but no one responded. (Id.) Defendant Gabriel watched the robbery unfold, saw Inmate Butler run away from Plaintiff's cell with a mask tied around his head, and did nothing aside from make a joke of the situation. (Id.) Plaintiff claims that, a few weeks before the robbery, he notified Defendant Seymour of the cash app incident, and Defendant Seymore "refused to take actions knowing [Plaintiff] was in danger." (Id. at 12.) Defendant Seymore claims he received such notice in March, not June, and notified his supervisors which resulted in Plaintiff being moved to a different cell. (Doc. 89, p. 2; see also doc. 87-17, p. 1.)

When jail officials took no immediate action in response to the robbery, Plaintiff's friends and family called the jail quickly to complain. (Doc. 69, p. 6.) Anita James, the mother of Plaintiff's son, called and spoke with Defendant Cheatham just after the robbery. (Id.) Approximately one hour after the robbery, Defendants Cheatham and Morrison entered A-Pod, and Defendant Cheatham was upset about his conversation with Ms. James. (Id.) Defendant Cheatham said to Plaintiff, "I'm tired of your family calling this jail. Pack your shit." (Id.) In retaliation, Defendant Cheatham moved Plaintiff back to G-Pod, where he had "a separation order and wasn't supposed to return" because of the armed robbery just five months earlier on January 10, 2023. (Id.; Doc. 92, pp. 10-11.) Plaintiff contends Defendant Cheatham knew Plaintiff was not to be housed in G-Pod due to the excessive risk

of him being assaulted but moved him there anyway in retaliation for the complaints from his family and friends. (Doc. 92, pp. 10-11; doc. 45, pp. 4, 5.)

Defendants acknowledge the armed robbery occurred on June 28 but disagree they did nothing in response. Citing an incident report prepared the following morning by Officer Ellison, Defendants contend Officer Ellison and Defendant Cheatham, along with other jail officials, removed all inmates from A-Pod to search for Plaintiff's belongings, and they transferred Plaintiff to G-Pod for his safety rather than to retaliate for Plaintiff's family members complaining. (SMF ¶¶ 13, 15.) Jail officials also engaged a certified deputy to investigate and pursue charges against Inmates Dawson and Butler. (SMF ¶¶ 14, 18.)

Plaintiff alleges G-Pod was "smoked out," overcrowded, the doors were broken, many inmates had shanks, and inmates were frequently stabbed and robbed. (Doc. 92, p. 11; doc. 69, p. 7.) Plaintiff described his reaction as he entered G-Pod on June 28, just one hour after being robbed in A-Pod, as follows: "Once I got in the dorm, I seen the same inmates from before in there so I knew Lt. Cheatham put me in there to get hurt on purpose because he had got into it with my son's mother, Ms. James." (Doc. 69, p. 7.) The reference to the "same inmates as before" means the inmates who committed armed robbery of Plaintiff in January. Plaintiff immediately "ban[g]ed on the window" to alert Defendant Morrison he was not safe in G-Pod. (Doc. 45, p. 11.) Defendant

Morrison reacted by walking out of the tower and away from Plaintiff. (Doc. 69, p. 7.)

As Plaintiff describes it, "[o]nce the inmates [saw Defendant Morrison] walk in another pod and wasn't coming to get me, they started taking my property and then a group of inmates just started beating, and stabbed me in the head." (Id.) The assailants were a group of armed inmates who surrounded Plaintiff, attacked him, robbed him, and stabbed him in the head. (Doc. 92, p. 12.) Officer Price witnessed this attack and called for backup. (SMF ¶¶ 16-17.) Plaintiff suffered a stab wound to the head and received staples to close the wound at a hospital that same evening. (SMF ¶ 17; doc. 87-9, p. 1; doc. 69, p. 7.) Defendants acknowledge the assault and stabbing occurred and report they placed the offenders, Inmates Rouse, Henley, Carias, on administrative segregation and pursued criminal charges against them. (SMF ¶ 18.)

Richmond County Sheriff's Deputies Ellison and Parks transported Plaintiff to the hospital. Because they did not work in the jail, Plaintiff confided in them he feared for his life and wanted to report Defendants' actions to the Georgia Bureau of Investigation ("GBI") and Internal Affairs because he believed they were trying to hurt him. (Doc. 92, p. 13; doc. 69, p. 8.)

### 2. Plaintiff Alleges that After the Four Violent Crimes, Defendants Placed Plaintiff in a Horrific Suicide Strip Cell and Severely Restricted His Rights

When Plaintiff returned from the hospital, it is undisputed that jail officials placed him on administrative segregation in a

11

suicide strip cell in G-Pod for four months, from June 29, 2023, through November 1, 2023, "PER LT CHEATHAM." (SMF ¶ 20; doc. 87-17, p. 1; doc no. 92, p. 13.) Defendants contend this assignment was for Plaintiff's protection, (SMF ¶ 20), while Plaintiff contends the assignment to a filthy cell, coupled with the nearly complete deprivation of all inmate privileges, constituted retaliation for Plaintiff's stated intention to contact GBI and Internal Affairs, the complaints lodged by family members and friends, and this lawsuit. (Doc. 92, p. 13.)

Plaintiff attests the conditions of his cell were nothing short of horrific. (Doc. 45, p. 7; doc. 92, p. 5; doc. 87-17, p. 1; doc. 87-14, p. 6.) When Plaintiff first entered the strip cell, and continuing throughout the four months of his occupancy, it was dirty and infested with "stink flies everywhere because the [toilet] hole in the floor didn't work . . . ." (Doc. 45, p. 7.) He had no sink or access to running water. (Id. at 5.) His toilet was a hole in the floor that did not drain, which forced him to urinate and defecate on lunch trays, cups, and trash. (Id.) These excrement-filled items stacked up inside the cell because jail officials did not regularly remove them, creating a stench so strong that it infiltrated the entire dorm and passersby often commented on the terrible odor. Plaintiff explains:

> Because I was forced to use the bathroom in empty trays
> and urinate in a cup to pour down the hole in the floor,
> it didn't flush so I had to keep it covered [and] the
> urine sat so long it smelt [sic] toxic. I wasn't allowed
> to clean my cell, or put the trash out. So a lot of

12

times the treys [sic] I used the bathroom in sat in the
room for days.

(Id. at 8.)

Plaintiff complained to Defendants Ashley, Captain Danko, and
Seymore about these conditions, claiming it constituted an
unreasonable threat to his health because of the stab wounds to his
head, failing kidneys, and hypertension. (Id.) Plaintiff also
complained to nurses, who said Defendant Mitchell ordered
Plaintiff's placement in that cell, and they could not do anything
about it. (Doc. 69, p. 9.) On August 15, 2023, Plaintiff's wisdom
teeth were removed, and he was returned to the strip cell despite
there being no running water and the dentist instructing Plaintiff
to rinse his mouth frequently. (Doc. 45, p. 10.) Nurse Taylor
Hertz informed Defendants that the cell conditions posed a danger
to Plaintiff in light of his tooth extractions, failing kidneys,
and hypertension, but they refused to move Plaintiff. (Id.; Doc.
69, p. 10.)

When Plaintiff complained to Captain Thomas from the
classification department about the deplorable conditions, she
dispelled the oft-repeated message from Defendants that they placed
Plaintiff there for his own safety. (Doc. 45, p. 9.) She candidly
explained, "You're housed there really because your family call the
jail, and be making a lot of complaints to the Internal Affairs."
(Id.) When family members continued to complain about Plaintiff's
living conditions and restrictions, "officials started to write . .

. disciplinary reports to justify restricting [Plaintiff's] privileges." (Doc. 69, p. 9.)

For the entire duration of his stay in the strip cell, jail officials severely restricted Plaintiff's visitation, phone, and recreation privileges, as well as his access to mail, the grievance system, medical treatment, running water, and showers. (Id. at 5, 13; doc. 45, p. 7.) Plaintiff further alleges he was not provided proper nutrition on multiple occasions. (Doc. 92, p. 6; Doc. d5, p. 12.) For the entire first week, Plaintiff was not allowed to leave the suicide strip cell for any reason. (Doc. 45, p. 7.) Defendant Mitchell allowed Plaintiff to take his first shower on July 4, 2023, after Plaintiff "showed Sgt. Mitchell how [he] was still bloody from the attack, and hadn't been allowed to take a shower for a week." (Id. at 8.)

Within the first week or so of Plaintiff's transfer to the suicide strip cell, jail officials were hostile to his family and friends and turned at least four away when they came to visit, telling them a lie that Plaintiff was a troublemaker and suicidal. (Doc. 69, p. 8.) His father became so concerned about Plaintiff's well-being that he traveled from Florida and demanded to see his son to make sure he was safe because no family member had heard from him. (Id. at 8.) During the visit with his father, Plaintiff explained "this was all done to keep [him] from speaking about and being able to tell anybody how the defendants had allowed [him] to be injured." (Doc. 45, pp. 7-8.) When Defendants began receiving

complaints from Plaintiff's family and friends about the deplorable conditions of the suicide strip cell, they moved his phone time to the wee hours of the morning when everyone was asleep. (Id. at 8; doc. 58, p. 18; doc. 69, p. 9.)

Plaintiff alleges that, on August 30, 2023, he was lying in his cell asleep when Defendants Gabriel and Morrison "took two frozen packouts threw them very had and hit me in my head." (Doc. 45, p. 12.) Defendants concede these officers worked in Plaintiff's pod that evening but contend jailers do not have access to frozen food. (SMF ¶ 3.)

On August 24, 2023, Plaintiff was taken to I-Pod for recreation time, to use the phones, and to shower. (SMF ¶ 22; see also doc. 92, p. 14.) Plaintiff contends Defendant Coleman read Plaintiff's mail concerning this lawsuit on this date. (Doc. 92, p. 14.) Plaintiff alleges Defendant Coleman took Plaintiff and another inmate to I-Pod for showers at approximately 2:00 p.m. (Id.) Plaintiff asserts he was in the shower for approximately twenty minutes when he heard Defendant Coleman let the other inmate out of the showers, but Defendant Coleman left Plaintiff in the showers for over three additional hours. (Id.; see also doc. 45, p. 11.) By Plaintiff's account, Deputies Myers and Gillette told Plaintiff no Webster Center deputies were permitted to let him out of the showers, only Defendant Coleman could. (Doc. 92, pp. 14-15.) Plaintiff further claims Defendant Coleman locked him in the shower for so long because, the day before, Plaintiff confided to Defendant Coleman

that he was under a short deadline for legal work in this lawsuit. (Doc. 45, pp. 10-11.)   When finally released from the shower for phone time, Plaintiff admits he slammed the receiver against the wall because he was mad about being left in the shower for so long. (SMF ¶ 23; see also doc. 92, p. 15.)   Plaintiff claims he did so out of frustration, and although the phone was not damaged, Defendant Matthys wrote a disciplinary report against Plaintiff for attempting to damage jail property.   (Doc. 92, p. 15; doc. 87-10; SMF ¶ 23.)

On August 26, 2023, Plaintiff attests Defendant Culyer, as well as non-party Deputies Fern and Koontz, took all of Plaintiff's legal mail and property and placed him in F-Pod, "the most dangerous pod full of gang members" in response to Plaintiff filing this lawsuit. (Doc. 92, p. 18.)   Plaintiff explains that, by this date, "word had got around the jail that I was receiving legal mail, and was filing a suit against [the Sheriff's Department]," and officers were "trying to find any reason to do something" to him.   (Doc. 45, p. 11.)   The cell to which Plaintiff was moved had no running water, and the dorm within F-Pod was the worst in the entire prison with broken doors and the highest number of gang members.   (Id.)   The dorm was so dangerous that Plaintiff cut his wrist to force a transfer out of there, and this strategy worked.   (Id. at 12.)   Citing the summons returned executed by the United States Marshals, Defendants contend Defendant Culyer only learned about this suit upon being served with a copy of the complaint on October 3, 2023.   (SMF ¶ 25.)

Plaintiff attests that, after the Court conducted a hearing

to inquire about his conditions of confinement and well-being, Defendant Mitchell commented to Plaintiff that he need not abide by the Court's remarks concerning safeguards to ensure Plaintiff's confinement did not violate the Constitution. (Doc. 69, pp. 1-2.) Furthermore, while Defendant Mitchell finally moved Plaintiff out of the strip cell after the hearing, he "made his officers enforce even more rules and restrictions" on Plaintiff. (Id. at 2.)

### 3. Plaintiff Alleges Defendants Fabricated Disciplinary Reports to Punish Plaintiff Without Due Process in a Concerted Attempt to Retaliate Against Him

Plaintiff accuses Defendants of utilizing disciplinary reports and related punishments as a means to justify their retaliatory conduct of keeping him in the deplorable strip cell and withholding basic rights. (Doc. 92, p. 15; doc. 69, p. 9.) Plaintiff attests Defendants charged him with petty misconduct, prohibited him from attending disciplinary hearings, based findings of guilt solely on reports from the accusing officer, failed to give him credit for time served on lockdown, and imposed sentences of lockdown that were nearly meaningless because he was "already locked down 23 and 1." (Doc. 92, pp. 19-21.)

For example, Plaintiff attests that, on August 10, 2023, Defendant Cowart immediately placed him on lockdown, without due process, for passing an object from one inmate to another upon their request. (Doc. 45, p. 9.) "She did this without a hearing just to take my phone and rec [privileges]." (Id.) On August 22,

2023, Defendant Fluellen sentenced him for this violation without a hearing and imposed a period of lockdown as punishment without giving him credit for the time already served on lockdown since August 10. (Id. at 10.) On August 26, 2023, when word spread in the jail about this lawsuit, jail officials fabricated a charge that he tore tint off the window in his strip cell as a pretext to transfer him into the worst dorm in the jail, and to confiscate all of his personal property and legal materials. (Id. at 11-12.)

**B.    Defendants' Summary Judgment Evidence**

Of the twenty defendants, only Defendant Seymore submitted an affidavit to counter Plaintiff's allegations, and his denials focus on a single allegation of him failing to take action when Plaintiff notified him of being in danger. (See doc. 89.) The remaining nineteen defendants rely solely on jail activity logs, leaving mostly unrebutted Plaintiff's allegations of a jail rife with violence, deplorable cell conditions after the stabbing, systematic retaliation, and manipulation of the disciplinary process.

Jail officials maintain daily activity logs to record when inmates in administrative segregation receive recreation, meals, showers, medical visits, and cell cleanings. (SMF ¶ 4; doc. 87-6.) Defendants did not submit daily activity logs for the period of June 29 through August 27, 2023, which is the time period when Plaintiff alleges the harshest treatment and most severe deprivations. The daily activity logs submitted by Defendants

only cover the period of August 28, 2023, through November 5, 2023. (<u>See</u> doc. 87-6.)    These activity logs show the following, among other things, for this time period.    Plaintiff received breakfast, lunch, and dinner every day.    (SMF ¶ 7; ¶¶ 30-31.)    In the month of September, Plaintiff showered five times on September 1, 5, 11, 15, and 18, and he never declined a shower opportunity.    In October, he showered nine times on October 4, 9, 11, 17, 18, 21, 23, 27, and 28, and he declined showers four times on October 12, 20, 22, and 29.    (SMF ¶¶ 30-31 & Exs. D, K, L.)    Plaintiff's cell was cleaned on September 11, 20, 21, 23, 25, and 26, and October 9, 12, 13, 14, 15, 18, 19, 28, 30, and 31.    Plaintiff received a restroom break on September 1, 11, 12, 15, 18, and October 4 and 27.    (<u>Id.</u>)    The Court presumes "restroom break" means occasions when officials allowed Plaintiff to leave his cell to visit a restroom.    (<u>See</u> doc. 87-6.)    "Uniform/Linen Exchange" occurred once in September on the 25th, and twice in October on the 13th and 15th.    (<u>Id.</u>)

Medical forms spanning October 4, 2022, through August 5, 2023, document occasions when Plaintiff refused to take his medications.    There is also a July 5, 2023, progress note documenting Plaintiff's refusal of medical treatment, submitted in support of the broader statement that Plaintiff often refuses medical treatment.    (SMF ¶ 35; <u>see also</u> doc. 87-15.)    Defendants also contend "Plaintiff has received all medical care requested or necessary" while at Webster Center.    (SMF ¶ 35.)

Defendants also submitted incident reports to support their contention that Plaintiff has consistently received notice and an opportunity to be heard for each alleged disciplinary violation.[3] The records submitted for the relevant time period of 2023 show the following:

- Incident Report # 329:  For a January 26, 2023, incident involving Plaintiff and four cellmates possessing contraband described as "wires, screws, unknown sheets of paper, and other items that was not [sic] prohibited for them to have," Plaintiff received verbal notice of the disciplinary report the same day.  (Doc. 87-12, p. 43.)  There is no indication Plaintiff received written notice of the disciplinary report.  (See id. at 43-55.)  On January 27, 2023, Plaintiff signed an "Inmate Rights Statement" and an "Inmate Disciplinary Hearing Waiver."  (Id. at 54-55.)  With his signature on the Inmate Rights Statement, Plaintiff elected twenty-four hours to prepare a defense and to attend the disciplinary hearing.  (Id. at 54.)  However, the "Inmate Disciplinary Hearing Waiver" indicated Plaintiff waived his right to be present at the disciplinary hearing.  (Id. at 55.)  The sections of the Incident Report form used to document the details of a disciplinary hearing are blank.  (See id. at 43-45, 53.)  Although it is unclear whether a hearing was held, a note timestamped 8:33 p.m. on January 31 states, "[A]ll are guilty of the contraband. all placed on lockdown."  (Id. at 45.)  There is no indication Plaintiff received written notice of the outcome of the disciplinary report.  (See id. at 43-55.)

- Incident Report # 2748:  For a July 1, 2023, incident involving Plaintiff possessing contraband described as "several sheets of discolored paper" suspected to be "possible drugs" that Plaintiff "stash[ed] in a Bible," Plaintiff received verbal notice of the disciplinary report on July 1.  (Id. at 28.)  On July 9, 2023, Plaintiff received written notice of the report, refused to sign an "Inmate Rights Statement" or an "Inmate Disciplinary Hearing Waiver" indicating whether he

---

[3] Defendants also submitted incident reports from 2021 and 2024 not summarized herein.  (See doc. 87-12, pp. 33-37 (#2021-00007793); id. at 38-42 (#2021-00007779); doc. 87-13, p. 1 (#2024-00000966); id. at 2 (#2024-00000162).)

intended to attend the disciplinary hearing, and told an investigator the contraband "was not his." (Id. at 28, 31-32.) A hearing was held on July 11 with Defendant Fluellen as the hearing officer. (Id. at 28.) The hearing start time was 1:43 p.m. and the section titled "inmate plea" was left blank. (Id.) A note timestamped 1:46 p.m. states, "Base [sic] on the deputy report and the supervisor report the inmate is found to be guilty." (Id. at 29.) Plaintiff was sanctioned to fifteen days of disciplinary separation. (Id. at 28-29.) There is no indication Plaintiff was ever given notice of the outcome of the disciplinary hearing. (See id. at 28-32.)

- Incident Report # 3339: For an August 10, 2023, incident involving Plaintiff possessing contraband described as "two strips of paper that were slightly discolored yellow that could possibly be k2," Plaintiff received verbal notice of the disciplinary report the same day. (Id. at 19-20.) Although the strips of paper were confiscated and "sent off for testing," the record does not contain any reference to the results of such testing to show whether the paper contained K2, a synthetic form of marijuana. (See id. at 19-25; see also doc. 87-2, p. 10 (describing K2 as synthetic marijuana).) There is no indication Plaintiff received written notice of the disciplinary report. (See id. at 19-27.) On August 16, 2023, Plaintiff refused to sign an "Inmate Rights Statement" or an "Inmate Disciplinary Hearing Waiver" indicating whether he intended to attend the disciplinary hearing. (Id. at 26-27.) A hearing was held on August 22 with Defendant Fluellen as the hearing officer. (Id. at 19.) The hearing start time was 9:44 a.m. and the section titled "inmate plea" was left blank. (Id.) A note timestamped 9:48 a.m. states, "Base [sic] on the deputy report and the supervisor report the inmate is found to be guilty." (Id. at 20.) Plaintiff was sanctioned to thirty days of disciplinary separation and was given notice of the outcome of the disciplinary report on September 5, 2023. (Id.)

- Incident Report # 3544: For the August 24, 2023, incident involving Plaintiff repeatedly hitting a phone receiver against the wall, Plaintiff received verbal notice of the disciplinary report on August 31. (Doc. 87-10, p. 1.) Although there is no indication Plaintiff ever received written notice of the disciplinary report, a supervisor approved the incident report on September 11, 2023. (Id.) No disciplinary hearing was conducted, and

the disciplinary review concluded on October 30, 2023, with no sanctions imposed. (Id.)

- Incident Report # 3737: For a September 8, 2023, incident involving Plaintiff threatening to "throw fecal matter at" a deputy, Plaintiff received verbal notice of the disciplinary report the same day. (Doc. 87-12, pp. 14, 16.) On September 18, 2023, Plaintiff was given a copy of the disciplinary report, but refused to sign an "Inmate Rights Statement" or an "Inmate Disciplinary Hearing Waiver" indicating whether he intended to attend the disciplinary hearing. (Id. at 17-18.) A hearing was held on September 20 with Defendant Fluellen as the hearing officer. (Id. at 15.) The hearing start time was 4:53 p.m. and the section titled "inmate plea" was left blank. (Id.) A note timestamped 4:55 p.m. states, "Base [sic] on the deputy report and the supervisor report the inmate is found to be guilty." (Id.) Plaintiff was sanctioned to thirty days of lost privileges, though the "Discipline Type" listed on the Incident Report reads, "Loss Privileges - Max 15 days," and was given notice of the outcome of the disciplinary report on September 28, 2023. (Id. at 15-16.)

- Incident Report # 4818: For a November 28, 2023, incident involving Plaintiff passing a note to an inmate on "lock down" without permission, Plaintiff received verbal notice of the disciplinary report the same day and was "placed on lock down" the following morning. (Id. at 6-7.) Plaintiff signed an "Inmate Rights Statement" dated December 6, 2023, and received a copy of the disciplinary report on December 7th. (Id. at 10.) With his signature on the Inmate Rights Statement, Plaintiff indicated he wished to waive his right for extra time to prepare a defense but intended to attend the disciplinary hearing. (Id.) An "Inmate Disciplinary Hearing Waiver" dated December 7, 2023, also documented Plaintiff's intent to attend the hearing. (Id. at 11.) The notes concerning investigation of the incident, also dated December 7, note, "INMATE WAS GIVEN A COPY OF THE D/R PAPERWORK WILL TAKE PART IN THE D/R HEARING." (Id. at 6.) Nonetheless, the section of the incident report titled "Review History," timestamped just one minute later, reads, "INMATE GREENE WAS GIVEN A COPY OF THE D/R PAPERWORK WILL NOT TAKE PART IN THE D/R HEARINGS." (Id. at 7.) Plaintiff's hearing was held on December 11 with Defendant Fluellen as the hearing officer. (Id. at 6.)

22

The hearing start time was 3:01 p.m. (Id.) The section titled "inmate plea" was left blank. (Id.) A note timestamped 3:07 p.m. states, "Base [sic] on the deputy report inmate Green was the inmate passing the note. Inmate Green is found to be guilty." (Id. at 7.) Plaintiff was sanctioned to twenty days of lost privileges, though the "Discipline Type" listed on the Incident Report reads, "Loss Privileges – Max 15 days," and was given notice of the outcome of the disciplinary report on December 20, 2023. (Id.)

- Incident Report # 4983: For a December 10, 2023, incident involving Plaintiff slamming a phone on the ground, Plaintiff received written notice of the disciplinary report on December 13. (Id. at 1-2.) An undated "Inmate Rights Statement" included a box checked "yes" indicating Plaintiff wished to be present at the disciplinary hearing. (Id. at 4.) However, Plaintiff also signed an "Inmate Disciplinary Hearing Waiver" dated December 13, 2023. (Id. at 5.) A hearing was held on December 15 with Defendant Fluellen as the hearing officer. (Id. at 1.) The hearing start time was 12:25 p.m. (Id.) The section titled "inmate plea" was left blank. (Id.) A note timestamped 12:26 p.m. states, "Base [sic] on the deputy report and the supervisor report the inmate is found to be guilty." (Id. at 2.) Plaintiff was given notice of the outcome of the disciplinary report on December 28, 2023. (Id.)

## III. DISCUSSION

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that,

"on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59). A genuine dispute as to a material

fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### A. Defendants Mitchell, Shelton, Roberts, and Geetings Are Not Entitled to Summary Judgment on the Conditions of Confinement Claim

"[T]he Constitution does not mandate comfortable prisons." Chandler v. Crosby, 379 F.3d 1278, 189 (11th Cir. 2004) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).    Rather, the constitutional standard requires prisoners receive adequate food, clothing, shelter, and medical care, and prison officials must take reasonable measures to ensure prisoner safety.    Farmer v. Brennan, 511 U.S. 825, 832 (1994).    "Inmates cannot expect the amenities, conveniences and services of a good hotel." Alfred v. Bryant, 378 F. App'x 977, 980 (11th Cir. 2010) (per curiam).  This standard is the same for both pre-trial detainees and inmates serving a term of imprisonment.    See Christmas v. Nabors, 76 F.4th 1320, 1330-31 (11th Cir. 2023) (explaining pretrial detainee must satisfy Eighth Amendment standard to prevail on claim under Fourteenth Amendment); Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985) (same).

Challenges to conditions of confinement are subject to a two-part analysis.    Chandler, 379 F.3d at 1289.    First, Plaintiff must satisfy an objective prong by showing the conditions about which he complains are sufficiently serious.    Id.    The conditions of his confinement must be "extreme" such that it "poses an unreasonable

risk of serious damage to his future health or safety." Id.; see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010); Ivory v. Warden, 600 F. App'x 670, 676 (11th Cir. 2015) (per curiam). "[B]oth the severity and the duration of [a] prisoner's exposure to" a particular condition are relevant to the determination of whether the condition is "extreme." Chandler, 379 F.3d at 1295. "The risk must be 'so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'" Redding v. Georgia, 557 F. App'x 840, 843 (11th Cir. 2014) (per curiam) (citing Helling v. McKinney, 509 U.S. 25, 33 (1993)).

Second, Plaintiff must satisfy a subjective prong by showing Defendants acted with a culpable state of mind, which is judged under the "deliberate indifference" standard. Proving deliberate indifference requires proof a defendant knew of and disregarded an "excessive risk to inmate health or safety," acted with "subjective recklessness as used in the criminal law," and did not "respond[] reasonably to the risk." Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citing Farmer, 511 U.S. at 839, 844-45). A prison condition does not violate the Constitution unless it involves "the wanton and unnecessary infliction of pain." Chandler, 379 F.3d at 1289.

Defendants do not move for summary judgment on the second element of Plaintiff's claim, but instead focus on the first element by arguing activity logs and other prison records conclusively prove

Plaintiff "had adequate access to food, water, medical care, mail, and showers." (Doc. 87-2, p. 12.) However, as explained below, Plaintiff's description of the conditions while housed in the suicide strip cell is sufficient for jurors to reasonably find an unreasonable risk of serious damage to his health or safety, exposure to which violated contemporary standards of decency.

Immediately after the stabbing, Defendants placed Plaintiff in the suicide strip cell from June 29, 2023, through November 1, 2023. Plaintiff alleges that, from the moment he first occupied it, the cell was filthy and filled with "stink flies," and the toilet hole did not drain, which forced him to use the restroom on trays, in cups, and in the trash. The stench was unbearable because officers did not remove the excrement-filled trash from his cell frequently, such that the urine became putrid. The strip cell had no running water for him to keep his head wound clean, he was not permitted to clean the bug-infested cell or take regular showers, and he was deprived of drinking water. (Doc. 58, pp. 17-20; see also doc. 92, pp. 5, 13-15.) For the first week he was in the strip cell, Plaintiff was not permitted to take a shower and wash off the blood until he complained and was allowed to take one shower. For an unspecified time period after the stabbing, Plaintiff "wasn't allowed showers, phone calls, or any medical treatment for [his] fresh wounds." (Doc. 92, p. 13.)

Citing only activity logs and other prison records, Defendants contend Plaintiff's jail conditions did not fall below the

constitutional standard and "Plaintiff's allegations are completely contradicted by the evidence, and Plaintiff can provide absolutely no evidence to support any of his allegations." (Doc. 87-2, p. 14.) There are at least three reasons why these logs and records are insufficient to wholly reject Plaintiff's sworn statements and award summary judgment to the defense.

First, the activity logs only cover the period of August 28, 2023 to November 5, 2023. Plaintiff first entered the suicide strip cell on June 29, 2023, and Defendants provide no explanation for the two-month gap in the logs. The missing time period is critical because Plaintiff's sworn statements paint the bleakest of pictures concerning his treatment and cell conditions during this period. (See docs. 87-2, 87-6; SMF ¶ 4.)   Second, Defendants present no testimony to rebut the multitude of disturbing, sworn allegations by Plaintiff that, in essence, accuse Defendants of punishing Plaintiff for complaining by throwing him in a filthy cell, isolating him from the world, and withdrawing even the most basic rights.

Third, the activity logs are not convincing proof of proper conditions and treatment. Nothing in them suggests the strip cell was clean, the toilet hole drain was working, Plaintiff was not forced to relieve himself in cups, trays, and trash that stacked up in his cell, there were no "stink flies," and the odor was not nauseatingly foul. On the contrary, even in the limited time period provided, these records show Plaintiff received only five showers in the first six weeks covered by the records. During this same

six-week period, the strip cell was not cleaned at all in four of the six weeks. Finally, if the toilet hole did not drain as Plaintiff alleges, the activity logs confirm he would have had no choice but to relieve himself in trays, cups, and trash because he was only provided a restroom break on seven occasions during the entire nine weeks covered by the logs.

Crediting Plaintiff's sworn statements and viewing the evidence produced by Defendants in the light most favorable to Plaintiff, the Court easily concludes there is a genuine dispute of material fact precluding summary judgment on Plaintiff's conditions of confinement claim. This is particularly true in light of Plaintiff's allegation that he was exposed to such dirty conditions while suffering from failing kidneys, hypertension, a stab wound to the head, and surgical removal of two teeth. See, e.g., Brooks v. Warden, 800 F.3d 1295, 1304 (11th Cir. 2015) (holding plaintiff "sufficiently alleged a substantial risk of serious harm, as the health risks of prolonged exposure to human excrement are obvious"); Saunders v. Sheriff of Brevard Cnty., 735 F. App'x 559, 568 (11th Cir. 2018) (per curiam) (explaining "cases in which 'the deprivation of basic sanitary conditions . . . constitute an Eighth Amendment violation' are plentiful, and some of them expressly hold that extended exposure to human excrement violates the Constitution") (citing Brooks, 800 F.3d at 1304)); McCoy v. Kavli, No. 1:22-CV-419-ACA-GMB, 2024 WL 5466678, at *12 (N.D. Ala. Nov. 19, 2024), adopted by 2025 WL 603008 (N.D. Ala.

Feb. 25, 2025) (collecting cases and explaining "the combination of the unsanitary cell—tainted by [plaintiff]'s and another inmate's waste—and the lack of running water, toilet, or shower would amount to a deprivation of basic sanitary conditions").

Importantly, Defendants do not argue that, even if the conditions of Plaintiff's confinement were unconstitutional, the allegations against them individually are insufficient, or relatedly that some or all of them lacked the requisite knowledge or job responsibilities to be held liable on such a claim of institution-wide deficiencies. The Court thus has no ability to consider whether there is a basis for summary judgment against each defendant individually, and the claims will proceed to trial as originally asserted against Defendants Mitchell, Shelton, Roberts, and Geetings.

**B.    Defendants Mitchell, Jenkins, White, Ashley, Cheatham, Shelton, Daniels, and Harrell Are Not Entitled to Summary Judgment on the Claim That Webster Center Is Exceedingly Violent**

A prisoner seeking to impose liability for an Eighth Amendment claim must establish the existence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Lane v. Philbin, 835 F.3d 1302, 1307(11th Cir. 2016) (internal quotations omitted).[4]  These three

---

[4] As explained in Part III(A), pretrial detainee Fourteenth Amendment deliberate indifference claims are analyzed under Eighth Amendment standards. See Christmas, 76 F.4th at 1330-31; see also Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of Eighth Amendment's Cruel and Unusual Punishment Clause. . . . However, the

elements are evaluated in part by an objective standard and in part by a subjective standard.  See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).  Defendants do not contest the third element.  Instead, they argue (1) Webster Detention is not exceedingly violent; and (2) Defendants responded reasonably when they learned of the attacks against Plaintiff in January and June 2023.  As explained below, however, Plaintiff has presented evidence that is sufficient at the summary judgment stage as to both the first and second elements of this claim.

### 1. Reasonable Jurors Could Find A Substantial Risk of Serious Harm

"On substantial risk of serious harm, 'this objective standard embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . , but must be balanced against competing penological goals.'"  Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993)).  A prisoner has a right "to be reasonably protected from constant threat of violence."  Id. at 1320 (quoting Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973)).  However, a "prison custodian is not the guarantor of a prisoner's safety."  Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990).  "An excessive risk of inmate-on-inmate violence at a jail creates

---

applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.") (citations omitted).

a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014). Viewing the evidence in a light most favorable to Plaintiff, reasonable jurors could find that conditions at Webster Center presented inmates with a constant and substantial threat of serious harm.

In his sworn statements, Plaintiff alleges "when people get stabbed, it's fights, and robberies all day every day in this jail," and officers "sit back and allow people to be assaulted, and robbed . . . ." Plaintiff describes G-Pod as overcrowded with broken doors, armed gang members, and frequent stabbings. (Doc. 92, p. 11.) Jail staff cannot control inmate movements and inmates "are known to keep shanks, stab, and rob people." (Id.) "All of the doors was [sic] broken so none of the doors in the dorm or the whole G-Pod locked." (Doc. 45, p. 5.) In G-Pod, Plaintiff alleges, "there wasn't even enough room in none of the cells for me . . . ." (Id.) F-Pod is even worse, according to Plaintiff, and is "the most dangerous pod full of gang members" with broken doors and the highest number of gang members. (Doc. 92, p. 18.) The dorm in F-Pod was so dangerous Plaintiff cut his wrist so that he would be moved, and this strategy worked. (Id. at 12.) Plaintiff's detailed allegations suggest the same problems and level of dangerousness

exist in A-Pod. Indeed, when Plaintiff describes the four violent crimes perpetrated against him in the six-month period of January to June 2023, the picture that emerges is one of excessive dangerousness, understaffing, and deferred maintenance across the entire jail.

In January while in G-Pod, six armed gang members robbed Plaintiff. (Id.; Verified Compl., doc. 45, p. 4.) Jail officials transferred Plaintiff to A-Pod, which provides protective housing to inmates threatened by gang members, and yet by early June, armed gang members had threatened to harm Plaintiff if he did not arrange for an electronic transfer of $300. Despite many pleas for help, no jail official responded to the threat until Plaintiff and his cellmate refused to return to the dorm from the recreation yard. (Doc. 45, p. 4.)

Later that same month in A-Pod, on June 28, inmate Butler attacked Plaintiff with a shank while multiple gang members congregated outside his cell. (Doc. 92, p. 10). The attack was brazenly conducted within eyesight of Defendants Gabriel and Ellison. Officer Ellison "was in the tower by himself" and called for backup on his radio "but no one responded." (Doc. 92, p. 10.) When officials transferred Plaintiff to G-Pod that same day, Plaintiff instantly knew he was in danger because the same gang members who assaulted and robbed him in January were still housed in G-Pod. Only thirty minutes after his arrival, "a group of

inmates with shanks" brazenly attacked Plaintiff within view of two officers who did nothing because Plaintiff "was surrounded." (Doc. 45, p. 5)  The mob beat Plaintiff and stabbed him in the head.  (Id. at 6.)  When Plaintiff and his family complained, the only solution officials could identify to keep Plaintiff safe was to transfer him into complete isolation in a deplorable suicide strip cell.  Officers taunted him about his predicament, Plaintiff alleges, "saying 'we can't put you nowhere, you're always getting your ass beat.'"  (Id. at 9.)

Defendants argue "Plaintiff has provided no evidence of any extreme conditions . . . or evidence of any serious inmate-on-inmate violence."  (Doc. 87-2, p. 6.)  The Court disagrees and finds the allegations summarized above sufficient to demonstrate the requisite excessive risk of inmate-on-inmate violence that creates a substantial risk of serious harm.  Defendants present no evidence whatsoever to paint a more reassuring picture of the conditions.  There is no information to dispel the allegations of overcrowding, understaffing, broken door locks, or constant violence.  Nor is there any suggestion of basic crime prevention and gang management methods.

The current summary judgment record is close to Marsh v. Butler County, Ala., 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007), in which conditions creating a risk

of serious injury included no segregation of different types of inmates, overcrowding, faulty cell locks allowing freedom of movement for inmates, no lockdowns of prisoners at any point in the day, no inmate screening, no disciplinary procedure, and no visual inspection of cells. Also, in Hale v. Tallapoosa County, 50 F.3d 1579, 1581-84 (11th Cir. 1995), a prisoner plaintiff's claims survived summary judgment because the prison did not segregate inmates by proclivity for violence, only one jailer was on duty at certain times in the day, prisoners' cells could not be seen or heard from the guards' quarters, and fights resulting in injuries requiring medical attention were constant. Id. Further, Marsh and Hale both concerned a prisoner who was physically beaten and injured as a result of the violent conditions, just as Plaintiff alleges here. See Marsh, 268 F.3d at 1029 (alleging assault by four inmates resulting in lacerations and broken bones); Hale, 50 F.3d at 1581 (alleging prisoner beaten by two inmates without provocation).

In contrast, the Eleventh Circuit affirmed summary judgment for the defense in a case alleging excessive prison violence because: (1) the prison was not understaffed when comparing number of guards to inmates; (2) prison officials segregated inmates based on crimes committed and potential for conflict with other inmates; (3) prison officials punished inmates for violence; and (4) serious inmate-on-inmate violence was not even close to something of the

norm. Purcell, 400 F.3d at 1321-23. And in Harrison, the Eleventh Circuit held thirty-three attacks over three years in a prison housing between 830-990 inmates was "hardly sufficient to demonstrate . . . a prison 'where violence and terror reign.'" 746 F.3d at 1299-1300 (quoting Purcell, 400 F.3d at 1320). Here, in contrast to Purcell and Harrison, there is no evidence of crime prevention methods, efforts to punish offenders, the frequency of inmate-on-inmate violence, or the level of staffing and inmate population.

### 2. Reasonable Jurors Could Find Defendants Were Deliberately Indifferent to the Excessively Dangerous Jail Conditions

"A prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Lane, 835 F.3d at 1308 (quoting Farmer, 511 U.S. at 837)). As the Eleventh Circuit explained,

> The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm. To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted).

Here, Defendants argue only that they responded adequately to each criminal attack on Plaintiff by relocating him and investigating the crimes.   (Doc. 87-2, pp. 6-7.)   The argument misses the mark entirely.  The question is not whether Defendants adequately responded to each attack, but instead whether they were aware of excessively violent conditions at the jail and responded reasonably to mitigate them.  A reasonable juror could find yes, they knew, and no, they did not respond in an objectively reasonable manner.

"'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.' Thus, 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Hale, 50 F.3d at  1583-85 (quoting Farmer, 511 U.S. at 842).

Here, if reasonable jurors believe Plaintiff's description of the dangers within Webster Center, the same jurors could reasonably conclude the dilapidated state of the jail and excessive risk of violent attacks on Plaintiff and other inmates was obvious.   In addition, Plaintiff alleges directly that Defendants knew of the dangerous conditions.   Indeed, after describing G-Pod as overcrowded with broken doors, armed gang members, and frequent stabbings, Plaintiff states that jail staff cannot control inmate movements, and inmates "are known to keep shanks, stab, and rob

people." (Doc. 92, p. 11.)  He concludes his description of G-Pod with the statement that "Lt. Cheatham, and all [jail staff] knew these are facts." (Id.)

Furthermore, Plaintiff's sworn statements are rife with examples of the jail's gang and violence problems being broadcast to Defendants. After the armed robbery in January 2023, Plaintiff filed a grievance, and his fiancé emailed Internal Affairs and called Officers Thomas, Jenkins, and Harrell. (Doc. 69, p. 3.) The Southern Center for Human Rights sent former Sheriff Roundtree a letter complaining about the danger Plaintiff faced. (Id.) When gang members in A-Pod began robbing inmates, Plaintiff's fiancé again emailed Internal Affairs and also called the Sheriff's Department, as did family members of other A-Pod inmates, and inmates staged a protest. (Id. at 4.) In early June, when gang members attempted to force a $300 electronic transfer, Plaintiff "wrote letters to every officer that worked that walked the Pod A-C" while, at the same time, his fiancé made calls to the jail. (Doc. 45, p. 4.) Plaintiff also staged a protest by refusing to leave the recreation yard, which prompted Internal Affairs to become involved. (Id. at 5.)

When Plaintiff was attacked on June 28, 2023, his ex-girlfriend, the mother of his son, and his brother each "called Defendants" to complain. (Doc. 92, p. 10.) Defendant Cheatham remarked he was moving Plaintiff to G-Pod "because he was tired of

[his] family calling the jail." (Doc. 45, p. 4.) Upon his return to G-Pod, Plaintiff spoke with Captain Johnson about the dangerous conditions, and his fiancé filed multiple complaints by email with Internal Affairs. (Id. at 4-5.) While being treated at the hospital for his stab wounds, Plaintiff told Deputy Parks he was afraid for his safety, and Deputy Parks relayed these concerns to Defendant Cowart. (Id. at 6.)

With respect to the objective component, reasonable jurors could also find Defendants disregarded the excessively dangerous jail conditions by failing to respond in an objectively reasonable manner. Indeed, Plaintiff's sworn statements are replete with references to him complaining to Defendants about the dangerous state of the jail and no one taking any corrective action. Defendants offer nothing at summary judgment to suggest otherwise.

For all of these reasons, there is no basis for summary judgment on this claim. Importantly, Defendants do not argue that, even if the jail is exceedingly violent, the allegations against them individually are insufficient, or relatedly that some of them lack the requisite knowledge or job responsibilities to be held liable on such a claim of institution-wide deficiencies. The Court thus has no ability to consider whether there is a basis for summary judgment against each Defendant individually, and the claims will proceed to trial as originally asserted against Defendants Mitchell, Jenkins, White, Ashley, Cheatham, Shelton, Daniels, and Harrell.

**C. Defendants Mitchell, Cowart, Fluellen, Geetings, Shelton, Harrell, and Matthys Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claims**

The Due Process Clause protects against deprivations of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. Wolff v. McDonnell, 418 U.S. 539 (1974) governs the due process safeguards afforded to both pretrial detainees and convicted inmates in disciplinary hearings. Jacoby v. Baldwin Cnty., 835 F.3d 1338, 1346 (11th Cir. 2016). The Court must consider whether an inmate has a protected liberty interest, and as to convicted inmates, the Supreme Court has identified the following as triggering such due process protections: (1) "a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court"; or (2) "the state has consistently given a certain benefit to prisoners . . . and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995).). However, pretrial detainees such as Plaintiff need not face punishment severe enough to constitute an atypical and significant hardship. "Rather, a pretrial detainee is entitled to a due process hearing before being subjected to 'conditions [that] amount to punishment.'" Jacoby, 835 F.3d at 1348 (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

Here, Defendants appear to concede, at least for summary judgment purposes, that the disciplinary measures taken against Plaintiff constitute punishment that entitles a pretrial detainee to due process.  Due process requires

    (1)   advance written notice of the charges against them;
    (2)   an opportunity for the inmate to call witnesses and present documentary evidence, so long as doing so is consistent with institutional safety and correctional goals; and
    (3)   a written statement by the factfinder outlining the evidence relied on and the reasons for the disciplinary action.

O'Bryant v. Finch, 637 F.3d 1207, 1213 (11th Cir. 2011).  In addition, "[p]rison officials need discretion to limit access to other inmates to collect statements or to compile other documentary evidence[,] and are not required to state specific reasons for refusing to provide that certain witnesses be called." Smith v. Rabalais, 659 F.2d 539, 543-44 (5th Cir. Unit A Oct. 1981) (internal quotation omitted)[5]; see also Casado v. Hastings, No. CV 214-135, 2015 WL 5092614, at *6 (S.D. Ga. Aug. 27, 2015) (holding failure to provide discovery containing DNA testing of disputed evidence in prison disciplinary proceeding did not violate due process).

Merely waiving a hand in the general direction of the disciplinary records submitted as defense Exhibit J, Defendants make sweeping arguments that (1) for every disciplinary report,

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Plaintiff received notice of the charges, notice of his rights, and an opportunity to participate in the hearing; and (2) Plaintiff often waived his right to appear or refused to sign the notice and waiver forms.  While the disciplinary records touted by Defendants do suggest Plaintiff received notice of the charges and his rights, they do not establish beyond reasonable debate that he was afforded an opportunity to attend the hearings.  Indeed, these same records show Plaintiff was not present for any of the six disciplinary proceedings, the outcome was a finding of guilt every time, the only evidence considered were the statements of his accusers, and each hearing lasted an average of approximately three minutes.

Defendants contend Plaintiff often waived his right to appear, but their own records belie this assertion.  Indeed, for Incident Report Number 4818, Plaintiff reserved his right to attend the hearing twice but inexplicably was not in attendance for the hearing.  On two occasions, for Incident Report Numbers 4983 and 329, Plaintiff stated he would attend the hearing when signing the Inmate Rights Statement but signaled the opposite intention when signing the Inmate Disciplinary Hearing Waiver.  In this ambiguous context, Defendants held the hearing without Plaintiff.  Plaintiff apparently refused to sign both forms on three occasions for Incident Report Numbers 2748, 3339, and 3737.  Defendants assert his refusal to sign the waiver of appearance constitutes, by itself, an affirmative waiver of the right to appear.  They cite

no precedent in support of this surprising proposition. Furthermore, Defendants merely offer prison records recording Plaintiff's alleged refusals to sign the hearing forms, which are met by Plaintiff's sworn allegation that he wanted to attend each hearing and Defendants deprived him of this right. A jury must review the record and decide this disputed issue of fact.

Finally, Defendants argue there can be no due process claim for Plaintiff's transfer to the suicide strip cell on June 20, 2023, because Defendants Mitchell and Cheatham effected this transfer "for his safety and not as punishment." (Doc. 87-2, p. 11.) The argument misses the mark because the scope of the due process claim does not include this transfer, which Plaintiff alleges was an act of retaliation rather than a violation of his due process rights.

For these reasons, Defendants Mitchell, Cowart, Fluellen, Geetings, Shelton, Harrell, and Matthys are not entitled to summary judgment on Plaintiff's due process claims.

D. **Defendants Mitchell, Shelton, Cheatham, Geetings, Coleman, Culyer, Cowart, Matthys, Daniels, Harrell, and Ashley Are Not Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

To prevail on a retaliation claim, Plaintiff must show "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship

between the retaliatory action and the protected speech." <u>Williams</u> <u>v. Radford</u>, 64 F.4th 1185, 1192 (11th Cir. 2023) (citing <u>Smith v.</u> <u>Mosley</u>, 532 F.3d 1270, 1278 (11th Cir. 2008)).  In general, "[a] prisoner's filing of a grievance concerning his conditions of imprisonment is protected speech under the First Amendment" as is the filing of a lawsuit.  <u>Thomas v. Lawrence</u>, 421 F. App'x 926, 928 (11th Cir. 2011) (<em>per curiam</em>) (citing <u>Douglas v. Yates</u>, 535 F.3d 1316, 1321 (11th Cir. 2008)); <u>Smart v. England</u>, 93 F.4th 1283, 1289 (11th Cir. 2024) (grievance); <u>Bennett v. Chitwood</u>, 519 F. App'x 569, 575 (11th Cir. 2013) (<em>per curiam</em>) (lawsuit).

In his sworn statements, Plaintiff alleges that Defendants retaliated against him for complaining and filing this lawsuit by transferring him into dangerous conditions, isolating him in a filthy suicide strip cell, denying him basic rights, and fabricating disciplinary charges as pretext.  In response, Defendants submit no testimony from the accused Defendants to contest Plaintiff's troubling narrative.  Instead, they make a generalized causation argument then nitpick isolated details of Plaintiff's narrative.  As explained below, these arguments do not entitle Defendants to summary judgment.

### 1. Reasonable Jurors Could Find Retaliation Motivated Defendants' Actions

Defendants argue Plaintiff cannot prove causation because their "actions in transferring Plaintiff into different pods for his safety, in sanctioning him for violating CBWDC rules, and in

44

generally maintain[ing] security of the CBWDC were not done to retaliate against Plaintiff." (Doc. 87-2, p. 9.) Defendants cite no evidence and do not bother with factual details. Such a generalized argument does not merit consideration. Even if it did, Plaintiff's sworn statements paint a detailed and credible picture of retaliation on a grand scale to punish Plaintiff for complaining about the jail and prosecuting this lawsuit.

"The causation prong 'asks whether the defendants were subjectively motivated' by the plaintiff's protected speech." Moulds v. Bullard, 345 F. App'x 387, 393 (11th Cir. 2009) (*per curiam*) (quoting Smith v. Mosley, 532 F.3d 1270,1278 (11th Cir. 2008)).

> "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on his motion for judgment as a matter of law or prior to trial on summary judgment."

Smith, 532 F.3d at 1278 (citing Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977)). "To defeat a summary judgment motion, a plaintiff need not adduce clear and convincing evidence of improper motive, but he must produce evidence from which a jury could find by a preponderance of the evidence, that retaliation was the but-for cause of the challenged action." Rager v. Augustine, No. 515-CV-35, 2017 WL 6627416, at *7 (N.D. Fla. Nov. 8, 2017) (citing Crawford-El v. Britton, 523 U.S. 574, 590-

95, 600 (1998)), *adopted by* 2017 WL 6627784 (N.D. Fla. Dec. 28, 2017), *aff'd*, 760 F. App'x 947 (11th Cir. 2019) (*per curiam*).

Viewing the evidence in a light most favorable to Plaintiff, reasonable jurors could find by a preponderance of the evidence that retaliation was the but-for cause of Defendants' actions. Indeed, reasonable jurors could find that, on the heels of Plaintiff and his family complaining about him being the victim of two violent crimes on June 28, jail officials were motivated by retaliation when they transferred him to a horrific suicide strip cell and imposed nearly total lockdown conditions for four months. As Captain Thomas allegedly admitted to Plaintiff about the suicide strip cell, "You're housed there really because your family call the jail, and be making a lot of complaints to the Internal Affairs." (Doc. 45, p. 9.)   The retaliatory treatment continued, Plaintiff alleges, and Defendants did not transfer him out of the suicide strip cell into a nicer cell until after the Court conducted a hearing on November 1, 2023.  Even after this transfer, Plaintiff alleges Defendants continued to withhold rights from him that are regularly afforded to other inmates.

### 2. Defendant Coleman Is Not Entitled to Summary Judgment on the Retaliation Claim

Plaintiff alleges that, on August 23, 2023, he told Defendant Coleman jail officials had denied him a shower and phone, and he needed a phone to arrange for an attorney to represent him in this lawsuit.  Defendant Coleman gave Plaintiff "his word that he was

gonna start taking me to take showers, and use the phone to handle business." (Doc. 45, p. 10.) The very next day on August 24, Plaintiff attests, Defendant Coleman locked Plaintiff in the shower for three hours, from 2:00 to 5:00 p.m. Once released, Plaintiff explains as follows: "So once I got on the phone, a few minutes after somebody answered the phone, they made me get off the phone." (Id. at 11.) Plaintiff points out Defendant Coleman knew Plaintiff needed to call law firms, and he accuses Defendant Coleman of locking him in the shower until 5:00 p.m., the typical close of business time for law firms, "on purpose to keep me from handling my affairs with the courts." (Id.)

With no reference to the three prima facie elements of a retaliation claim, Defendants argue that on the day Plaintiff claims Defendant Coleman locked him in the shower, Plaintiff got in trouble for banging a phone against the wall and they attach disciplinary records to prove the point. Plaintiff admits he banged the phone in frustration but explains this occurred after Defendant Coleman locked him in the shower for three hours. Defendants never contend Defendant Coleman locked Plaintiff in the shower as punishment for banging the phone, nor could they in light of the timeline. In short, the defense's argument is entirely irrelevant and does not entitle Defendant Coleman to summary judgment.

Defendants argue there is no causal connection because, according to Plaintiff's own allegations, Defendant Coleman "took no issue with Plaintiff's lawsuit . . . ." (Doc. 87-2, p. 7.) This is a skewed characterization of Plaintiff's allegations. Plaintiff paints a clear picture of Defendant Coleman feigning support by promising to help him with regular showers and phone calls, only to yank the rug out from under him the very next day by subjecting Plaintiff to a tortuously long shower and premature terminations of his phone call attempts. Reasonable jurors could find, by a preponderance of the evidence, that retaliation was the but-for cause of Defendant Coleman's actions.

Defendants point to phone logs as conclusive proof Plaintiff was able to make phone calls that same day. (Def. Ex. H, doc. 87-11.) These uncertified phone logs purport to show twenty-eight phone calls made by Plaintiff that day, but the logs are better left for cross examination because they are not a model of clarity and seem to omit critical information such as timing and duration of each call. Furthermore, Plaintiff might have attempted twenty-eight phone calls in the same day if, as he alleges, Defendant Coleman and his colleagues prematurely terminated his phone calls.

### 3. Defendant Mitchell Is Not Entitled to Summary Judgment on the Retaliation Claim

The entirety of the argument for summary judgment in favor of Defendant Mitchell on the retaliation claim is that he did nothing to prevent Plaintiff from purchasing legal items from the

commissary.    (Doc. 87-2, p. 8.)    However, the scope of the retaliation claim against all Defendants, including Defendant Mitchell, as allowed at screening is much broader than this one isolated allegation.    The single argument thus does not entitle Defendant Mitchell to summary judgment on the retaliation claim. In addition, Defendants submit no evidence and make no supporting points as to the narrow argument they raise, choosing instead to incorporate by reference arguments made earlier in the case but in an entirely different legal context of injunctive relief.    The Court will not do defense counsel's work for it by perusing the docket to piece together old arguments for the sake of analyzing summary judgment.    For these reasons, Defendant Mitchell is not entitled to summary judgment on the retaliation claim.

### 4. Defendants Shelton, Harrell, Matthys, Geetings, and Cowart Are Not Entitled to Summary Judgment on the Retaliation Claim

This group of defendants argue they are entitled to summary judgment on the retaliation claim as it relates to disciplinary proceedings because (1) each disciplinary report was fully justified and well-founded; (2) Plaintiff was found guilty of each violation after notice and an opportunity to be heard; and (3) these defendants "were not even involved in most of the disciplinary reports, which were initiated by Defendants Mitchell, Rodriguez, Smith, Fern, Zimmer, Luckie, and Perez." (Doc. 87-2, p. 8.)

Defendants submit a total of seven disciplinary reports for Plaintiff in the year 2023. The problem, however, is that Defendants never bother to discuss the details. Instead, they argue in the most general fashion possible that each disciplinary report was well-founded, Plaintiff was found guilty after sufficient due process, and some defendants were not involved in some of the reports. Such generalities do not suffice, and the Court will not parse the evidentiary record to piece together the myriad details missing from Defendants' argument.

Even if the Court were inclined to do the defense's work for them, they offer no testimony to rebut Plaintiff's sworn statements and there are many details in the disciplinary reports that are consistent with Plaintiff's narrative. Indeed, six of the seven disciplinary reports issued in 2023 came after Plaintiff was stabbed on June 28, 2023, with the first coming just days after the stabbing, and the most common punishment was continuation of disciplinary segregation. Furthermore, Plaintiff never admitted guilt to any charge, Plaintiff never attended the hearing, Plaintiff was always found guilty based solely on statements by his accusers, and time stamps show hearings only lasted two to three minutes.

### 5. Defendants Daniels and Ashley Are Not Entitled to Summary Judgment on the Retaliation Claim

Plaintiff attests that Defendants Daniels and Ashley retaliated by signing and approving disciplinary reports, and

refusing to give him credit for time served, after he complained to them about retaliatory acts by other Defendants. These two Defendants do not submit affidavits to contest Plaintiff's sworn allegations. Instead, they argue "Plaintiff . . . can provide no evidence of any such disciplinary reports." (Doc. 87-2, p. 9.) True enough, the unverified disciplinary reports submitted by the defense as Exhibit J do not document involvement by Defendants Daniels and Ashley. However, Plaintiff made his allegations against them in his sworn statements, and he further attests Exhibit J is not a full and complete record of all relevant disciplinary reports. (Doc. 92, p. 21.) On this summary judgment record, reasonable jurors could find in favor of Plaintiff, and these Defendants are not entitled to summary judgment.

**E.  Defendants Morrison and Gabriel Are Not Entitled to Summary Judgment on Plaintiff's Excessive Force Claim**

Plaintiff attests that, on August 30, 2023, he was asleep in his strip cell when Defendants Morrison and Gabriel opened his door and hit Plaintiff in the head with two "frozen packouts." (Doc. 45, p. 12.) As a pretrial detainee, Plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015); see also Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1181 (11th Cir. 2020). Whether the application of force was objectively reasonable is a fact-specific inquiry and cannot be evaluated in a "post-hoc fashion or 'with the 20/20 vision of hindsight.'" Piazza v.

Jefferson Cnty., Ala., 923 F.3d 947, 953 (11th Cir. 2019) (quoting Kingsley, 576 U.S. at 397). A list of non-exhaustive factors "in determining the reasonableness of force include: the relationship between the need for force and amount used; the extent of the injury; efforts made by the officer to limit the amount of force; the severity of the security problem; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Mathews v. Wetherbee, 839 F. App'x 395, 397 (11th Cir. 2020) (per curiam) (citing Kingsley, 576 U.S. at 397). "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Kingsley, 576 U.S. at 397 (quoting Bell, 441 U.S. at 540, 547.

Defendants concede Defendants Morrison and Gabriel were working in Plaintiff's pod on the night of the alleged attack, and neither Defendant Morrison nor Defendant Gabriel has submitted any statement refuting Plaintiff's sworn allegation of the unprovoked attack. Nonetheless, Defendants contend no reasonable juror could believe Plaintiff because (1) the daily activity log shows Plaintiff was fed dinner at 7:02 p.m. and mentions nothing about this incident occurring; (2) although Plaintiff saw a medical provider the following morning, there is no record evidence of why; and (3)

inmates are served food that is warmed and not frozen, and officers do not have routine access to frozen food items. (Doc. 87-2, pp. 2-3.) None of these facts render the attack impossible or so highly unlikely to have occurred that no reasonable juror would believe Plaintiff's sworn statements. Indeed, at summary judgment, the Court may not weigh the credibility of conflicting evidence in the record. Johnson v. Lang, No. 19-14278, 2022 WL 2734421, at *4 (11th Cir. July 14, 2022) (per curiam) ("Johnson is correct that the district court erred by accepting Lang's affidavit testimony where it conflicted with Johnson's sworn complaint.); Greer v. Ivey, 767 F. App'x 706, 710 (11th Cir. 2019) (per curiam) (citing Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006)). The argument thus fails, and neither Defendant is entitled to summary judgment on this claim.

### F.    Defendants Mitchell, Seymore, Robinson, Gabriel, Cheatham, and Morrison Are Entitled to Summary Judgment on the Failure to Protect or Intervene Claims, But Defendant McKenzie Is Not So Entitled

"Merely negligent failure to protect an inmate from attack does not justify liability under § 1983." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citation omitted). Liability attaches when there is a conscious disregard of a serious and imminent risk. Farmer, 511 U.S. at 835-39; see also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (requiring a plaintiff to show "more than mere negligence," and stating that courts are to look for "obduracy and wantonness, not inadvertence or error in

good faith"). Therefore, a prisoner seeking to impose liability for a failure to protect claim must establish the existence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (internal quotations omitted). These three elements are evaluated in part by an objective standard and in part by a subjective standard. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

> As the Eleventh Circuit has explained,
>
> When examining the first element—a substantial risk of serious harm—the court uses an objective standard. The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm. To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

Id. (internal citations and quotations omitted). The deliberate indifference prong of the test requires proof that a defendant knew of and disregarded an "excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. It must also be proven a defendant acted with "subjective recklessness as used in the criminal law" by showing a defendant was "actually, subjectively aware his own conduct caused a substantial risk of serious harm to the plaintiff," but even if he knew of that substantial risk, he

is not liable under the Eighth Amendment "if he responded reasonably to the risk." Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citing Farmer, 511 U.S. at 839, 844-45). The same analysis applies to Plaintiff as a pretrial detainee because the standards are the same under the Fourteenth and Eighth Amendments. Christmas v. Nabors, 76 F.4th 1320, 1330-31 (11th Cir. 2023); Hamm v. DeKalb Cnty., 774 F.2d 1567, 1574 (11th Cir. 1985).

### 1. Defendant McKenzie Is Not Entitled to Summary Judgment

Plaintiff alleges that, on January 10, 2023, Defendant McKenzie heard inmate Zaiara Smith and multiple other gang members threaten to rob and assault him. (SMF ¶ 8; see also doc. 87-5, p. 1; doc. 69, p. 2.) Later that same day, Deputy McKenzie unlocked the doors separating the top and bottom tiers of the pod in violation of protective custody protocol requiring separation of top and bottom tier inmates. (Doc. 92, p. 7.) When he unlocked the doors, these same gang members who threatened Plaintiff walked downstairs armed with shanks and robbed Plaintiff, stealing commissary items. (Id.; Verified Compl., doc. 45, p. 4; doc. 69, p. 2.) Plaintiff filed a grievance, and Webster Center officials found Defendant McKenzie had "nothing to do with" the incident and relocated Inmate Smith. (See doc. 87-5.)

Viewing the evidence in a light most favorable to Plaintiff, reasonable jurors could find (1) the threat by gang members to rob

and assault Plaintiff was a substantial risk of serious harm; (2) Defendant McKenzie knew about the threat because he heard the inmates make it; and (3) Defendant McKenzie deliberately disregarded that risk by not taking any precautionary measures to protect Plaintiff and, instead, deliberately exposing Plaintiff to the danger by opening the top and bottom tier doors simultaneously in violation of jail protocol, and within hours of hearing the threats.

Defendants do not present any testimony from Defendant McKenzie denying Plaintiff's allegations. Instead, they merely attach unverified grievance logs purporting to memorialize determinations by jail officials that the robbery "had nothing to do with" Defendant McKenzie. (Grievance Log, doc. 87-5.) This is obviously an insufficient basis to reject Plaintiff's sworn account of the events.

### 2. Defendants Seymore and Robinson Are Entitled to Summary Judgment

Plaintiff claims that, "a few weeks before" inmates robbed and stabbed him on June 28, 2023, he wrote a note to Defendant Seymour stating he was in danger because of a recent attempt by armed gang members to force the electronic transfer of $300 from Plaintiff's fiancé. (Doc. 92, p. 12.) He claims Defendant Seymore "refused to take actions knowing [Plaintiff] was in danger." (Id.) By affidavit, Defendant Seymore testifies that, when Plaintiff told him on March 20, 2023, he "informed [his] supervisors in accordance with Webster Center policy" and "[a]s a result, [his] supervisors moved [Plaintiff] to a different cell." (Doc. 89, p.

2; see also doc. 87-17, p. 1.)   In support, Defendants submit Plaintiff's Inmate Housing History Report, which confirms Plaintiff was relocated on March 20, 2023, "PE[R] LT CHEATHAM,"[6] within the G-Pod; and on March 28, 2023, with the remark, "REHOUSED/ISSUE ON POD," from the G-Pod to A-Pod.  (Doc. 87-17, p. 1.)

Plaintiff disagrees that he notified Defendant Seymore on March 20, 2023 and claims instead a general time frame of "a few weeks before" June 28, 2023.  But the date discrepancy does not preclude summary judgment because Plaintiff merely guesses when he accuses Defendant Seymore of taking no action, and such speculation is wholly insufficient in the face of Defendant Seymore's testimony that he reasonably responded by informing his supervisors of Plaintiff's predicament.   Furthermore, even if Plaintiff is correct that he notified Defendant Seymore "a few weeks before" June 28, prison records confirm Plaintiff was also transferred on June 2, 2023.  (Id. at 1.)

For all of these reasons, no reasonable juror could find Defendant Seymore did nothing when he received Plaintiff's note and was deliberately indifferent to any substantial risk of serious harm.  The issue of qualified immunity is thus moot, and the Court will not address it.  See Martinez v. Burns, 459 F. App'x 849, 851

---

[6] The Inmate Housing History Report remark concerning this relocation reads, "PET LT CHEATHAM."  (Doc. 18-17, p. 1.)  Based on context from other entries on the Report, the Court presumes this was a typographical error and "per" was intended instead of "pet."  (See id.)

n.2 (11th Cir. 2012) (*per curiam*).

### 3. Defendant Gabriel Is Entitled to Summary Judgment On the Failure to Intervene Claim

Plaintiff alleges Defendant Gabriel failed to intervene when inmates Butler and Dawson robbed him on June 28, 2023, in A-Pod. To prevail on a failure to intervene claim, Plaintiff must show (1) another inmate's physical assault created a substantial, objective risk of injury, (2) of which a defendant is subjectively aware, (3) the defendant was in a position to intervene, and (4) the defendant did not respond reasonably to the risk of injury. See Johnson v. Boyd, 568 F. App'x 719, 724-25 (11th Cir. 2014) (*per curiam*). The reasonable response requirement has been described as follows:

> "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. More succinctly, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 845. We have said that a prison official violates the Eighth Amendment if he responds to a known risk "in an objectively unreasonable manner." Cottone [v. Jenne], 326 F.3d 1352, 1358 (11th Cir. 2003). An official responds to a known risk in an objectively unreasonable manner if "he knew of ways to reduce the harm but knowingly declined to act" or if "he knew of ways to reduce the harm but recklessly declined to act." Hale [v. Tallapoosa Cnty.,] 50 F.3d 1579, 1583 (11th Cir. 1995).

Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 619-20 (11th Cir. 2007).

For liability to attach, a prison official must have been "in a position to intervene." Terry v. Bailey, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citing Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998)). This means the officer must have been "physically able" with a "a realistic chance to intervene and act in time to protect the inmate plaintiff." Smith v. Andrews, CV 114-206, 2016 WL 6818755, at *4 (S.D. Ga. Nov. 16, 2016) (collecting cases), adopted by 2016 WL 7197446 (S.D. Ga. Dec. 9, 2016).

As courts have explained, "[r]egardless of the presence or absence of a weapon in the hands of the attacking inmates, 'no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.'" Seals v. Marcus, No. 1:11-CV-99 WLS, 2013 WL 656873, at *8 (M.D. Ga. Jan. 25, 2013) (quoting Longoria v. Texas, 473 F.3d 586, 594 (5th Cir. 2006)), adopted by 2013 WL 663579 (M.D. Ga. Feb. 22, 2013); see also Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995) ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required.").

Plaintiff's description of the incident does not provide any basis for a reasonable juror to find Defendant Gabriel was in a position to intervene. According to Plaintiff, two inmates armed with a shank entered his cell and robbed him while other members of the same gang stood outside his cell. (Doc. 92, p. 10.) To intervene, Defendant Gabriel would have necessarily risked his own life by pushing through a crowd of gang conspirators to confront the armed robbers. Furthermore, Plaintiff offers no details concerning timing and distance that could lead a reasonable juror to conclude there was sufficient time and proximity for Defendant Gabriel to intervene. Plaintiff thus fails to show Defendant Gabriel "was physically able and had a realistic chance to intervene and act in time to protect [Plaintiff]." Smith, 2016 WL 6818755, at *4. Notably, it is undisputed that jail officials responded after the robbery by removing all inmates from the A-Pod, conducting a search for Plaintiff's belongings, moving Plaintiff immediately to G-Pod, and assigning the investigation to a certified deputy to pursue charges against Inmates Dawson and Butler. (SMF ¶¶ 13, 14, 15, 18.)

For these reasons, Defendant Gabriel is entitled to summary judgment on this claim.

### 4. Defendant Morrison Is Entitled to Summary Judgment on the Failure to Intervene Claim

Plaintiff alleges that, immediately upon entering the G-Pod on June 28, 2023, Plaintiff "ban[g]ed on the window" to alert

Defendant Morrison he was not safe there. (Doc. 92, pp. 10, 11.) Within the next hour, according to Plaintiff, Defendant Morrison watched a group of armed inmates surround him, attack him, rob him, and stab him in the head, and Defendant Morrison did nothing to intervene. (Id. at 12.) Plaintiff's account, while horrific, does not provide any basis for a reasonable juror to find Defendant Morrison was in a position to intervene. Even more so than with Defendant Gabriel, Plaintiff's description shows Defendant Morrison would have necessarily risked his own life by confronting a crowd of armed attackers. Furthermore, as with Defendant Gabriel, Plaintiff offers no details concerning time and proximity to show Defendant Morrison "was physically able and had a realistic chance to intervene and act in time to protect [Plaintiff]." Smith, 2016 WL 6818755, at *4. To the extent Plaintiff criticizes Defendant Morrison for failing to protect him in advance of the attack, Plaintiff merely alleges he told Defendant Morrison he was not safe in that dorm without mentioning any details, much less a specific threat against Plaintiff that would have triggered a constitutional obligation to protect. See Washington v. Warden, 847 F. App'x 734, 736, 738 (11th Cir. 2021) (per curiam) (explaining general reputation for violence insufficient to impose liability and stating "[a] prisoner usually must communicate some reason beyond the mere existence of a threat that could permit prison officials to conclude that a particular threat was

substantial"); Marbury v. Warden, 936 F.3d 1227, 1236 (11th Cir. 2019) (*per curiam*) ("Successful deliberate-indifference claims will generally require some further reason—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm."); Carter v. Galloway, 352 F.3d 1346, 1350 (11th Cir. 2003) (finding no subjective awareness of risk where prison officials only possessed general awareness of plaintiff's attacker being problematic inmate); see also Est. of Owens v. GEO Grp., Inc., 660 F. App'x 763, 771-72 (11th Cir. 2016) (*per curiam*) (explaining vague concerns about safety, nor an unpredictable attack with no prior threat sufficient to establish substantial risk of serious harm); Davis v. Morgan, No. 2:23-CV-1208-LCB-GMB, 2025 WL 978597, at *5 (N.D. Ala. Feb. 19, 2025) ("[T]he Eleventh Circuit has recognized that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." (citation omitted), *adopted by* 2025 WL 978155 (N.D. Ala. Apr. 1, 2025).

For these reasons, Defendant Morrison is entitled to summary judgment on this claim.

### 5. Defendant Cheatham Is Entitled to Summary Judgment on the Failure to Protect Claim

Plaintiff alleges Defendant Cheatham failed to protect him because, when Plaintiff was attacked in A-pod on June 28, 2023,

Defendant Cheatham reacted by immediately transferring him to G-Pod despite knowing Plaintiff had been robbed by inmates in A-Pod six months earlier, and those same inmates were still housed in A-Pod. Plaintiff does not allege any actual and specific threat existed at the time Defendant Cheatham transferred him back to G-Pod. Instead, he only alleges Defendant Cheatham should have remembered the robbery six months earlier in G-Pod and transferred him somewhere else. While a reasonable juror might find Defendant Cheatham's transfer of Plaintiff in this context constituted negligence, no reasonable juror could find Defendant Cheatham consciously disregarded a serious and imminent risk. See Washington, 847 F. App'x at 736, 738; Marbury, 936 F.3d at 1236; Carter, 352 F.3d at 1350; see also Est. of Owens, 660 F. App'x at 771-72; Davis, 2025 WL 978597, at *5.

For these reasons, Defendant Cheatham is entitled to summary judgment on this claim.

### 6. Defendant Mitchell Is Entitled to Summary Judgment on Any Failure to Protect or Intervene Claim

The Court has carefully reviewed the sworn statements by Plaintiff and can find no allegation against Defendant Mitchell that is properly characterized as alleging a failure to protect or intervene. Accordingly, Defendant Mitchell is entitled to summary judgment on such claims.

**G.    Remaining Defendants Are Not Entitled to Qualified Immunity for Any of the Surviving Claims**

Defendants, as a collective group, argue they are entitled to qualified immunity as to all claims raised against any one of them in a two-paragraph statement that lacks any reference to specific facts or claims.  (Doc. 87-2, p. 14.)  As explained in detail below, no Defendant against whom claims remain is entitled to qualified immunity.

**1. Defendants Do Not Show They Acted Within Their Discretionary Authority**

"Qualified immunity shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Myrick v. Fulton Cnty., Ga., 69 F.4th 1277, 1300 (11th Cir. 2023) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982)).  "The officer bears the initial burden to prove that he acted within his discretionary authority[.]"  Dukes v. Deaton, 852 F.3d 1035, 1042 (11th Cir. 2017).

> "A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority.  Put another way, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."

Donald v. Norris, 131 F.4th 1255, 1263 (11th Cir. 2025) (citations omitted).  The Eleventh Circuit explains the Court "must ask

whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." Id. at 1264.

Here, Defendants state "it is undisputed that [they] were RCSO employees performing their duties within the" jail at all relevant times in the Second Amended Complaint. (Doc. 87-2, p. 14.) Though Defendants correctly note "[a]n officer acts within his discretionary authority if his actions were undertaken pursuant to the performance of his duties and within the scope of his authority," (id. (citations omitted)), Defendants do not meet their burden by making a bald assertion which does not differentiate between the twenty Defendants, does not provide any detail as to their various roles, and lacks any specific reference to the facts or Plaintiff's claims. Est. of Cummings v. Davenport, 906 F.3d 934, 939-40 (11th Cir. 2018) (explaining entitlement to raise qualified immunity shield is not automatic and recognizing insufficiency of bald assertion that actions taken within scope of discretionary authority); Barker v. Norman, 651 F.2d 1107, 1124-25 (5th Cir. Unit A July 1981) (explaining defendant's burden to establish discretionary authority requires "more than a bald assertion . . . that the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority; there must be a showing by competent summary judgment materials of objective circumstances that would

compel that conclusion"); <u>Kang v. Mayor & Aldermen of City of Savannah</u>, No. CV 421-111, 2022 WL 987944, at *8 (S.D. Ga. Mar. 31, 2022)(rejecting "bald assertion" of defendant acting pursuant to discretionary authority and in absence of substantive argument supporting such assertion, rejecting qualified immunity defense); <u>see also</u> <u>Baker v. City of Atlanta</u>, 662 F. Supp. 3d 1308 & n.4 (N.D. Ga. 2023)("[E]ven in the qualified immunity context – defendants must 'specifically and clearly' present their theories of qualified immunity to the district court." (citing <u>WBY, Inc. v. DeKalb Cnty., Ga.</u>, 695 F. App'x 486, 491-92 (11th Cir. 2017) (<i>per curiam</i>)); <u>Monroe Cnty. Emp. Ret. Sys. v. So. Co.</u>, 335 F. Supp. 3d 1315, 1318 (N.D. Ga. 2018) ("It is not the role of the Court to make arguments for the parties but to consider and decide the specific arguments made by the parties." (citing <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1284 (11th Cir. 2011).)

Thus, Defendants' one conclusory sentence, that is, a "bald assertion," about acting within their discretionary authority – without any supporting citation to any summary judgment record evidence tied to any specific Defendant or claim – is insufficient to carry their burden on this critical threshold issue. As the Court is unable to conclude each, or for that matter any, Defendant was acting within the scope of their discretionary authority, summary judgment based on qualified immunity grounds must be denied. <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1264

(11th Cir. 2004) ("A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds.")

### 2. Plaintiff Adequately Alleges Defendants Violated Clearly Established Constitutional Rights for Each Remaining Claim

Even had Defendants carried their burden of proof to establish they were acting within their discretionary authority, Defendants' remaining argument that Plaintiff has failed to show they violated any constitutional right is unavailing. "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." Holloman, 370 F.3d at 1264. The Court must apply a two-step qualified immunity analysis: "(1) whether, taken in the light most favorable to the injured party, the facts alleged show the officer's conduct violated a constitutional right; and (2) if the right violated under those alleged facts was clearly established at the time of the alleged violation." Myrick, 69 F.4th at 1297.

> "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."

T.R. by & through Brock v. Lamar Cnty. Bd. of Educ., 25 F.4th 877, 883 (11th Cir. 2022) (internal quotation marks and citations

omitted).  Under the third method, "a general constitutional rule may apply with 'obvious clarity,' such that there need be no prior holding of unlawfulness on the specific action(s) in question." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Here, the "obvious clarity" standard applies to each of Plaintiff's remaining claims because any reasonable officer should have realized the conditions and circumstances to which Plaintiff was allegedly exposed, as detailed above, violated the Constitution.  See, e.g., Taylor v. Riojas, 592 U.S. 7, 8-9 (2020) (per curiam) (concluding that because no reasonable correctional officer could have concluded that the conditions were constitutionally permissible, a constitutional rule applied with "obvious clarity") (citing Hope, 536 U.S. at 741); Brooks v. Warden, 800 F.3d 1295, 1307 (11th Cir. 2015) ("This is a rare case of obvious clarity. . . . Any reasonable officer should have known that such conduct was at war with the command of the Eighth Amendment.")(internal citations omitted).  Forcing a pretrial detainee to remain for months in a filthy cell without access to running water or restroom facilities beyond a clogged toilet hole, depriving him of drinking water, and allowing less than one shower per week for weeks on end (despite wounds and surgical sites that required regular cleaning) is obviously and clearly a violation of his constitutional rights.  So, too, is keeping a detainee in conditions known to be rife with gang violence and assaults,

isolating a detainee and fabricating disciplinary charges in response to his complaints, falsifying waivers after not allowing the detainee to attend disciplinary hearings, hitting a sleeping detainee in the head with "frozen packouts," and violating jail protocol by unlocking doors separating the detainee from prisoners who had threatened to rob and assault him. Thus, Plaintiff's allegations describe circumstances and conduct so egregious that even in the total absence of caselaw, no reasonable officer could have failed to conclude Plaintiff's constitutional rights were clearly violated.

Further, the Court finds ample authority that is factually analogous such that Plaintiff's rights were clearly established. Taylor, 592 U.S. at 7-9 (holding prison officers were not entitled to qualified immunity when the inmate was placed in one cell "covered in feces" and then another without access to working restroom facilities over the course of six days); Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974) (establishing due process demands prisoners be given the opportunity to call witnesses and present evidence in at disciplinary hearings unless inconsistent with safety or correctional goals); Sindell v. Coach, No. 24-13529, 2025 WL 2400462, at *3 (11th Cir. Aug. 19, 2025) (per curiam) ("[T]he law is clearly established that the use of force on compliant, nonresistant detainees is excessive.") (quoting United States v. Hill, 99 F.4th 1289, 1301 (U.S. 2024), cert. denied, 145

S. Ct. 2698 (2025); <u>Patel v. Lanier Cnty. Ga.</u>, 969 F.3d 1173, 1190 (11th Cir. 2020) ("[A]ll law-enforcement officials [are] on notice that if they actually know about a [medical] condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution."); <u>Piazza v. Jefferson Cnty., Ala.</u>, 923 F.3d 947, 952-53 (11th Cir. 2019) (explaining use of force on a subdued or otherwise incapacitated pretrial detainee is impermissible); <u>Brooks</u>, 800 F.3d at 1304 (collecting cases with the common thread that extended exposure to human excrement violates the Constitution); <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1103 (11th Cir. 2014) (holding defendants, who knew another inmate had already violently attacked plaintiff and still placed plaintiff in a cell with the same violent inmate without taking any action to mitigate the substantial risk of harm, violated the plaintiff's clearly established constitutional rights and were not entitled to qualified immunity); <u>Douglas v. Yates</u>, 535 F.3d 1316, 1321 (11th Cir. 2008) ("First Amendment rights. . . are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.") (internal citations omitted); <u>Wright v. Newsome</u>, 795 F.2d 964, 968 (11th Cir. 1986)(holding inmate raised a valid constitutional claim by alleging prison officials took actions against him "for filing lawsuits and administrative grievances").

Therefore, because Defendants failed to meet their burden of showing they acted within their discretionary authority in reference to any claim, Defendants are not entitled to summary judgment on qualified immunity grounds.   Further, even if Defendants had carried their burden on discretionary authority, viewing the facts and reasonable inferences in the light most favorable to Plaintiff, he has adequately alleged Defendants violated clearly established constitutional rights.   Thus, no remaining Defendants are entitled to qualified immunity for any surviving claim.

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** Defendants' summary judgment motion (doc. 87) and **GRANTS** summary judgment on the claims of deliberate indifference to Plaintiff's safety against Defendants Mitchell, Seymore, Robinson, Gabriel, Cheatham, and Morrison.   Thus, no claims remain against Defendant Seymore and Defendant Robinson.   The claims remaining to be tried are as follows:

1. conditions of confinement claims against Defendants Mitchell, Shelton, Roberts, and Geetings;

2. claims of deliberate indifference to safety generally at Webster Center against Defendants Mitchell, Jenkins, White, Ashley, Cheatham, Shelton, Daniels, and Harrell;

3. due process claims against Defendants Mitchell, Cowart,

Fluellen, Geetings, Shelton, Harrell, and Matthys

4. claims of retaliation against Defendants Mitchell, Shelton, Cheatham, Geetings, Coleman, Culyer, Cowart, Matthys, Daniels, Harrell, and Ashley;

5. claims of excessive force against Defendants Morrison and Gabriel; and

6. a claim of deliberate indifference to Plaintiff's safety against Defendant McKenzie.

**ORDER ENTERED** at Augusta, Georgia, this $\underline{26th}$ day of September, 2025.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA